MURRAY, J.
*910 After an argument precipitated by references to their respective gangs, the victim Christopher Sisoukchaleun, took off his shirt to fight defendant Antoine Lamar Blessett. Instead, defendant followed Sisoukchaleun into the street and shot him between the eyes at nearly point-blank range with a firearm he had retrieved only moments earlier from his pickup truck, which was parked nearby. Defendant then fired a second close-range shot, striking Sisoukchaleun in the torso.
A jury found defendant guilty of the first degree murder ( Pen. Code, §§ 187, subd. (a), 189 )[1] and possession of a firearm by a felon (§ 29800, subd. (a)(1) ). The jury also found true enhancements that defendant personally used a firearm and proximately caused death or great bodily injury (§ 12022.53, subd. (d) ), that he personally used a firearm in the commission of a felony (§§ 12022.5, subd. (a), 12022.53, subd. (b) ), and that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1) ). Defendant now appeals claiming numerous trial errors and that the 10-year sentence imposed pursuant to section 186.22 must be struck. Additionally, we granted defendant's request for supplemental briefing on *171 the impact of Senate Bill No. 620 and whether the matter must be remanded for the trial court to consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements.
In the published portion of this opinion we conclude that defendant's confrontation clause violation contentions under Crawford v. Washington (2004) 541 U.S. 36, 124 S.Ct. 1354, [158 L.Ed.2d 177] ( Crawford ) and People v. Sanchez (2016) 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320 ( Sanchez ) are forfeited because trial counsel failed to make a specific objection in the trial court concerning the confrontation clause violation *911 theories he now advances regarding the gang expert testimony. The boilerplate in limine motions filed prior to trial containing only a vague reference to the confrontation clause and the oral arguments made during the in limine motion hearing, in which no confrontation clause claim was made, were insufficient to preserve the contentions defendant now makes on appeal. Moreover, numerous decisional authorities published prior to defendant's trial made the imminent change in law ultimately announced in Sanchez reasonably foreseeable, alerting competent and knowledgeable counsel to the need to register appropriate objections. We further conclude that defendant has failed to establish that he received constitutionally ineffective assistance of counsel based on the forfeiture. As we explain, it was not unreasonable of counsel to forego an objection to the background hearsay, and, as to the admission of both the background hearsay and the case-specific testimonial hearsay relayed to the jury by the prosecution's expert, defendant has not shown prejudice.
In the unpublished portion of this opinion, we agree with defendant that the 10-year term for the gang enhancement must be struck. We further conclude that defendant's other claims of trial error are forfeited, without merit, or pertain to errors that were harmless or did not prejudice defendant. However, we shall remand for the trial court to consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements, and, in the event that the court declines to exercise that discretion, for the court to impose sentences on the section 12022.5, subdivision (a), and 12022.53, subdivision (b), firearm enhancements and then stay execution of those sentences pursuant to section 12022.53, subdivision (f). We otherwise affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The Prosecution's Case
The Shooting and Investigation
On the night of February 8, 2012, Weena Vue travelled to Sacramento from the Merced area with four girlfriends to hang out. They went to Casino Royale to eat. There they met the victim Christopher Sisoukchaleun (also known as Bud), Jack Thammavongsa, Sunny Manivong, Roger Bouriboune, Udom Ketphanh, and an individual named Lou. After leaving Casino Royale, the group drove in several cars to the Sunland Liquor store (Sunland), the location where the murder later occurred. Thammavongsa (Sisoukchaleun's cousin) drove Sisoukchaleun's car because Sisoukchaleun was drunk. The group arrived at Sunland at approximately 1:55 a.m.
*912 As they started walking from their parked car toward Sunland, Sisoukchaleun or Thammavongsa made a hand gesture. Manivong testified that Sisoukchaleun was "not throwing up no gang sign." Thammavongsa testified that Sisoukchaleun was "[t]hrowing up a peace sign" to the girls that pulled up in the other car. Manivong, *172 who also made hand gestures, testified that he did not throw up gang signs, but was simply pointing at Sisoukchaleun and Thammavongsa.[2]
As they walked up to Sunland, Thammavongsa and Sisoukchaleun both used the word "cuz" in their conversation, and Thammavongsa said something about wanting to race. According to Vue, an African-American male, 5'6? or 5'7? tall with closely cropped hair and wearing a black leather jacket and blue jeans with a design of wings or flames on them, who was standing near the door to Sunland, responded, " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' "[3] Vue also testified that the man said, " 'I am a Blood.' " According to Thammavongsa, after he said, " 'Cuz, get some drink,' " the man standing near Sunland, whom he identified as defendant, said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' " Vue testified that Sisoukchaleun responded, " 'Yeah, this is LAC, Little Asian Crip.' "[4] Thammavongsa acknowledged that such an exchange would amount to "[f]ighting words" because Bloods and Crips do not get along. According to Vue, while the conversation had not been aggressive at its inception, at this time, the African-American man "got into [Sisoukchaleun]'s face." According to Thammavongsa, Sisoukchaleun "got tired of hearing" defendant say " 'Blood, Meadowview.' " Vue became scared and went to her girlfriend's car.
According to Manivong, defendant walked to a white pickup truck parked nearby, opened a tool box, grabbed something, and put it in his back pocket. Sisoukchaleun removed his shirt and it appeared that he and defendant would fight. Sisoukchaleun and defendant walked into the street. Thammavongsa followed. The other guys in their group were "[r]ight there with us" according to Thammavongsa. Thammavongsa acknowledged that he would have intervened if Sisoukchaleun was getting beaten up.
*913 According to Thammavongsa, Sisoukchaleun was saying, " 'Let's fight,' " but defendant "didn't really say nothing" and was not squaring up to fight. Sisoukchaleun took a swing at defendant, but defendant dodged the blow. Defendant pulled out a gun. Manivong heard a woman say, " 'He's got a gun.' " Defendant then shot Sisoukchaleun in the face. Manivong, Thammavongsa, and Sisoukchaleun started running. Defendant fired a second shot and Sisoukchaleun fell, gasping for air, and then Manivong heard two more shots. Someone called 911. Defendant got into the passenger side of the pickup and was driven away by a woman. Manivong provided the pickup's license plate number to the police when they arrived approximately five minutes later.
Thammavongsa and Manivong both testified that no one in their group had any weapons that night. Vue never observed Sisoukchaleun or any of the other guys in their group with any weapons. Manivong *173 informed the police that the gun that was used was a .38-caliber revolver.
The parties stipulated that a video recording of the scene in the vicinity of the shooting recorded by a surveillance camera owned by the City of Sacramento accurately depicted that location on February 9, 2012, and the recording was introduced into evidence. We have reviewed the video. There is no sound, and the actual shooting takes place out of the camera view, but events before and after the shooting can be seen on the recording.
In the events as shown on the video recording, defendant was standing outside of Sunland when Thammavongsa and Sisoukchaleun, identified at trial on the video by Thammavongsa, arrived and approached the store. Manivong, who identified himself in the video, and Ketphanh approached from the other direction. Both Sisoukchaleun and Manivong made hand gestures. As the group approached, defendant emerged from Sunland's recessed entry and stood in front of the store. Defendant was briefly among Thammavongsa, Manivong, and an unidentified individual in front of the recessed entry. Thammavongsa almost bumped into defendant as he passed. It appears that defendant spoke with members of the group.[5] Defendant, Thammavongsa, Sisoukchaleun, Manivong, Vue, and others all crowded in the recessed store entry. Vue began to walk away from the storefront just as a white pickup truck driven by a woman parked in front of Sunland. Defendant walked to the white pickup, where it is undisputed he retrieved a handgun from a toolbox in the truck bed. The woman got out of the truck and walked *914 around the back of the truck toward defendant who was on the passenger side. She and defendant then approached the store. The woman walked into the recessed entry while defendant stayed back on the sidewalk gesticulating with his arms, bobbing his head toward the entryway and appearing to speak angrily to the people therein. Sisoukchaleun, identified at this point in the video by Manivong and Thammavongsa, removed his outer shirt and handed it to an unidentified individual. As defendant and Sisoukchaleun appeared to confront each other, Sisoukchaleun walked off of the sidewalk, into the street, and out of camera view while defendant can still be seen on the periphery of the frame. An unidentified African-American individual walked from the recessed entry and approached defendant with his arm extended. He then placed his arm over defendant's chest, appearing to speak to him and hold him back from the confrontation. At this time, Thammavongsa and Manivong gathered near defendant. Defendant appeared to speak somewhat animatedly with the unidentified African-American individual who had placed his arm over defendant's chest, pointing his finger at this person's chest. Thammavongsa and Manivong looked on. Defendant then walked around the African-American individual, off of the sidewalk in the direction Sisoukchaleun had walked, and out of the frame. In the meantime, the woman who had parked the truck walked behind the group and followed defendant out of the frame. Thammavongsa followed defendant out of the frame. A moment later, the unidentified individual *174 who took Sisoukchaleun's shirt can be seen ducking suddenly and retreating behind the white pickup truck. Most of the individuals in the vicinity then scattered. Sisoukchaleun himself can briefly be seen running away. The woman then walked back into the store entryway, received a package or bag, ran to the driver's door of the pickup, and got in. Defendant got in the passenger side of the pickup and left the scene, driven by the woman.
Officer Paul Fong, who arrived at the scene shortly after 2:00 a.m. was the first officer on the scene. Manivong relayed to Fong the license plate number of the pickup, and Fong broadcast that information immediately.
Later in the morning, Officer Konrad Von Schoech stopped a Kia in which defendant was a passenger. Von Schoech transported defendant to the police station. There, Detective Thomas Shrum intended to swab defendant's hands for gunshot residue. However, after his arrest, defendant asked to use the restroom. He was accompanied by Detective Shrum. As defendant was walking to the sink after urinating, Detective Shrum told defendant not to wash his hands. Defendant put his hands on the soap dispenser, looked at Shrum, soaped up his hands, and washed them anyway. Thereafter, Detective Shrum interviewed defendant briefly. During the interview, defendant claimed someone had stolen his truck.
*915 Detective Bryan Alonso participated in a search of the Kia the following day. Alonso discovered a set of license plates under blankets in the rear of the vehicle. Additionally, a bag in the Kia contained a rolled-up pair of jeans with a red design.
Alonso also participated in a search at a residence. In the backyard, police discovered a white F-150 pickup truck without license plates. The vehicle identification number of the truck corresponded to the license plates discovered earlier inside the Kia. In the truck, police found an empty prescription bottle bearing defendant's name and address.
Alonso participated in a search at defendant's apartment. Police discovered items bearing defendant's name. Additionally, police discovered a suitcase in the living room containing .380-caliber auto and nine-millimeter ammunition. Behind a television in the bedroom, police discovered a .40-caliber magazine and a black holster. Police also discovered a box of Remington .357-caliber ammunition containing 10 rounds and a box of Remington .38-caliber ammunition containing 33 rounds.
According to the forensic pathologist who conducted the autopsy on Sisoukchaleun, he sustained one gunshot wound"pretty much on the bridge of the nose, near the center of his face," and another on the left side of his torso. Sisoukchaleun died as a result of these gunshot wounds. The muzzle of the gun was approximately six inches away when it fired the shot that struck Sisoukchaleun in the face. The muzzle was approximately eight to ten inches away, possibly as little as six inches, when the bullet was fired that struck Sisoukchaleun in the torso. The bullet recovered from Sisoukchaleun's torso was a .38-caliber round. Sisoukchaleun's blood alcohol level was 0.28 percent.
Recorded Phone Calls from the Jail
Excerpts of recorded phone calls defendant made from the county jail were played for the jury. In a phone conversation later in the day after his arrest with someone he referred to as "Momma," defendant responded to a question about whether he committed the murder by repeating the claim that someone stole his truck. He said, "Somebody stole my damn truck man and they went and did a crime *175 man. Momma, now it-it just looks like I'm guilty."
In a phone conversation a day later with someone defendant identified as Grandma, he again said somebody had used his truck to commit a crime. When asked what kind of crime, defendant replied, "I think murder." He said he did not report his truck stolen because he had been drinking that night.
In a second call that day, defendant spoke with a male. The conversation begins after the male accepted the collect call from defendant.
*916 "Male: What's up cuz ? What's happening with it?
"Defendant: Man, it's looking all bad for the home team blood .
"Male: Blood , come on now.
"Defendant: Yep. It's real bad.
"Male: I'm hella mad b-I'm hella mad at you blood . I'm hella mad but, uh.
"Defendant: [¶] ... [¶] ... I don't even know what to do, man. I don't even know what to do. Right now it's just hush mode and wait until they say something to me, you dig what I'm saying?
"Male: Well, that's what you do then, blood ....
"Defendant: [¶] ... [¶] ... I mean somebody stole my shit man. And I [¶] ... [¶] I was too drunk to even call the police. I was too drunk, nigga. I had drunk two fifths to myself man." (Italics added.)
The following day, defendant had a phone conversation with a woman, during which she informed him that she had heard on the news that there was video of the shooting. Defendant's response was: "Are you serious?" He asked if his picture was on the video and then said again somebody had stolen his truck. He said he was too drunk to report it to the police and then said, "Shit. That's my story and I'm sticking with it." In discussing people with whom he was housed at the jail, defendant said, "They had a Crip in here. Long as that nigga don't say nothing crazy to me. [¶] ... [¶] Yeah and they forget. They remember when a mother fucker shot me in my back. That's why I can't be associated with no Crip. Because they-they remember when they-I got shot in my back. [¶] ... [¶] ... But when they shot me in my back, I was a youngster but I went to jail too. [¶] ... [¶] Because I was in sort of a gang shooting."
Defendant did not claim that he shot Sisoukchaleun out of fear for his safety or in self-defense during any of the recorded phone conversations.
Gang Expert Testimony
Detective Justin Saario testified as an expert in African-American criminal street gangs. According to Saario, respect is the ultimate driving force in gang culture. However, respect to gang members is not the same as respect understood by members of society at large. In gang culture, respect is forced *917 by instilling fear in rival gang members and in the community. For gang members, respect and fear are roughly synonymous. If a gang member is disrespected, there is an expectation that the situation "is dealt with," because disrespect shown to the gang member reflects poorly both on the gang member and the gang itself. In the absence of a response to a showing of disrespect, the individual and the gang will be perceived as weak.
Saario testified that Meadowview Bloods are a subset of the Bloods criminal street gang. They identify with the color red. Crip gangs, rivals to the Bloods, identify with the color blue. Crips use the term "cuz" in referring to one another, whereas Bloods use the term "Blood."
*176 LGC, or Lao Gangster Crip, is a North Sacramento Asian gang. Saario testified that Asian gangs emulate or "copycat" African-American gangs.
According to Saario, the primary activities of the Meadowview Bloods are robbery, burglary, narcotic sales, weapons possession, and assaults with deadly weapons, which have led to murders. Saario testified about predicate offenses involving three Meadowview Blood gang members, occurring on one occasion. He testified that they beat a Crip gang member and when the Crip fled, one of the three Bloods attempted to follow the Crip into his house armed with a firearm. The Crip obtained a gun, came out and shot one of the three Bloods. One of the Bloods was convicted of active participation in a criminal street gang, specifically the Meadowview Bloods; another was convicted of active participation in a criminal street gang, specifically the Meadowview Bloods, and felony battery; and the third was convicted of residential burglary, assault with a with force likely to cause great bodily injury, and being a felon in possession of a firearm and ammunition. Certified court records of these convictions were admitted into evidence. None of these individuals were involved in defendant's trial.
Saario testified about a series of prior crimes and contacts defendant previously had with law enforcement that aided in his opinion about defendant's gang affiliation. This testimony is the primary subject of defendant's confrontation clause claim.
In November 1991, defendant was walking in South Sacramento when a vehicle occupied by several African-American males drove by. One of the individuals shot at defendant, striking him in the back. At the time, defendant was wearing a red 49ers jacket and a red 49ers hat. Defendant initially denied being a gang member, but then acknowledged that "sometimes people think that he is with the Meadowview Bloods." According to defendant's friend or cousin, defendant was shot by a member of the Oak Park Bloods because of a rivalry that existed between the Meadowview Bloods and the Oak Park Bloods.
*918 In December 1992, police officers went to an address in response to a narcotics complaint. They discovered that there were several people at that location who were on searchable probation. Police came into contact with defendant, who was the subject of a felony warrant at the time. Police searched the residence and discovered 10 pieces of rock cocaine in a bedroom associated with a Mr. Wormley. As police were leaving the residence with defendant, Wormley entered the apartment. In his pocket, police discovered a "photograph of a male black individual and on the back of that photograph, it said, 'AY.B. from the M.V.B., bka des.' " Saario stated that M.V.B. stood for Meadowview Bloods. Defendant later confessed that, as police approached the apartment, he hid the rock cocaine in Wormley's bedroom.
On June 2, 1993, police stopped a vehicle occupied by defendant and the driver, Oscar Daniels, a "Blood associate." In the vehicle, police discovered a .22-caliber semiautomatic handgun in the driver's door.
On October 26, 1993, a police officer observed defendant riding a bicycle. The officer attempted to stop defendant, but defendant dismounted from the bicycle and ran. As the police officer chased defendant, defendant pulled out a rifle which he had concealed in his pants, and the officer shot defendant. At the time, defendant was wearing a red bandana. According to Saario, at that time, gang members commonly identified themselves with red or blue bandanas depending upon their affiliation. Defendant was identified in the police system *177 as a Meadowview Blood, and police noted the "Meadowview" tattoo on his left arm.
On January 11, 1995, police contacted defendant in connection with a domestic violence call. Defendant was wearing burgundy pants and was described as a Meadowview Blood.
On September 2, 1995, defendant and Daniels, wearing ski masks, drove up to a male who was in a parking lot placing his daughter into his vehicle. Either defendant or Daniels pulled out a gun and demanded the victim's wallet and keys. The victim ran away, and defendant and Daniels drove off. Sheriff's deputies-responding to this incident-stopped the vehicle defendant was driving. In the vehicle, officers discovered a red ski mask under the driver's seat and another ski mask under the passenger seat. Officers also discovered a .41-caliber Smith and Wesson revolver on the passenger's side of the vehicle. Defendant and Daniels were identified in a showup.
In April 2002, defendant committed gang-related crimes with Lawrence Barnett, a Del Paso Heights Blood.
Saario also relied upon the recorded phone call defendant made from the jail to the woman in which defendant said there was a Crip in custody with *919 him, but that as, " '[l]ong as that nigga don't say nothing crazy,' " defendant did not care. Saario testified that defendant went on to say, " '[t]hey remember when motherfucker shot me in my back. That's why I can't be associated with no Crip, because they remember. They remember when they-I got shot in my back.' " Saario testified defendant further said, "it was 'because it was sort of a gang shooting.' "
On cross-examination, the defense asked Saario about the phone conversation defendant had with the male the previous day, during which the male initially referred to defendant as " 'cuz.' " Saario stated that, while it was unusual for a Blood to call another Blood "cuz," these rules were not "etched in stone." Saario also noted that, during the conversation, the male speaking to defendant referred to defendant as " 'Blood' " multiple times and defendant also referred to the male as " 'Blood.' "
Saario testified that it is common for gang members to obtain tattoos identifying themselves. Saario personally observed a tattoo on defendant's left arm that said "Meadowview," and testified that this also weighed into his opinion regarding defendant's gang affiliation.
Based on defendant's background, his prior contacts with law enforcement, his Meadowview tattoo, and his statements about the Bloods and Meadowview just prior to shooting Sisoukchaleun, Saario opined that defendant was a member of the Meadowview Bloods.
Saario further opined that, in a hypothetical situation mirroring the facts of this case, the shooter's actions would benefit the Bloods. Saario elaborated: "That benefits the Bloods, based on the fact that the individual, the Blood gang member when being-it goes to the whole respect and disrespect aspect of a Crip gang member calling out using Crip terminology, and the [B]lood gang member taking offense to that, and challenging the Crip by saying, 'No, this is Bloods.' That puts everybody on notice. Crip gang member and anybody else that is there, that by you doing that, that is disrespectful to me being a Blood gang member. And by me saying, No, it's Bloods. This is Meadowview. I'm announcing that I'm a Blood gang member. And what you're doing is disrespect. [¶] There's two ways that it can go right there. The Crip can, 'Hey, man, sorry. You know, it all cool. Let's just hang out' or take offense to the challenge of him not respecting and challenging him by saying 'It's Blood'
*178 thing. And it's that drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods." Saario further testified that "[t]his is Meadowview" puts everyone on notice, "I'm Meadowview. This is what it's about. And basically, that's not gonna be allowed. You can't throw out Crip stuff when I'm a Blood." The reference to Meadowview communicated, "I represent Meadowview. I am Meadowview."
*920 With regard to hypothetical conduct mirroring defendant's actions in retrieving the gun from his truck, Saario testified, "At that point, the individual-once he puts out, 'I'm a Blood,' you know that that's just gonna-this is not gonna go anywhere good. And the individuals[ ] involved in it know that as well. [¶] ... [T]here's an ultimate sign of power within the gang culture, and that's a firearm. Individuals that are armed are more confident because they know that there's nothing more that anybody can have other than a firearm. There's not bazookas or anything like that around. So if you're armed, you have the ultimate weapon of power or item of power. [¶] So by going and getting that, that weapon, he knows that no matter what happens, there's nothing that I can be outdone with. So if I'm gonna go back and confront this person-there's a term, it's called, 'caught slipping.' Individuals that are caught slipping are individuals that engage in a confrontation without a weapon. Commonly people will say, I was caught slipping, you know, at a house party. You know, I didn't have a gun on me. I'm a gang member in a certain area. I didn't have my gun on me. I was caught slipping. [¶] So by him having his gun, he's not caught slipping. He knows that no matter what, he's got that-that back up, being the gun. No matter what happens, he's able to use it."
Saario testified that the hypothetical scenario was a typical gang escalation; "[w]e see it all of the time."
Defense Case
Defendant did not testify and the defense presented no witnesses. Trial counsel argued to the jury that defendant acted in self-defense or imperfect self-defense.
Verdict and Sentencing
The jury found defendant guilty of murder in the first degree ( §§ 187, subd. (a), 189 ) and possession of a firearm by a felon (§ 29800, subd. (a)(1) ). The jury also found all three firearm enhancements true (§§ 12022.5, subd. (a), 12022.53, subd. (b), 12022.53, subd. (d) ), as well as the gang enhancement (§ 186.22, subd. (b)(1) ).
The court sentenced defendant to a term of 85 years to life, calculated as follows: 25 years to life for murder in the first degree, doubled to 50 years to life for a prior strike conviction; a consecutive term of 25 years to life for the personal use of a firearm enhancement pursuant to section 12022.53, subdivision (d); and a consecutive term of 10 years on the gang enhancement (§ 186.22, subd. (b)(1)(C) ). The trial court stayed imposition of sentence on the section 12022.5, subdivision (a), and section 12022.53, subdivision (b), *921 enhancements.[6] The court imposed a term of two years on count two, possession of a firearm by a felon (§ 29800, subd. (a)(1) ), and stayed execution of that sentence.
DISCUSSION
I. Confrontation Clause Claim
Defendant contends that the trial court impermissibly allowed the prosecution's *179 gang expert to relay testimonial hearsay to the jurors in violation the confrontation clause and Crawford, supra , 541 U.S. 36, 124 S.Ct. 1354. In his original briefing, defendant argued that, under the then-recent United States and California Supreme Court case law, the practice of permitting a gang expert to convey testimonial hearsay statements to jurors in discussing the bases for the expert's opinion had lost its viability. While this appeal was pending, our high court decided Sanchez, supra , 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320, and we granted defendant's motion for supplemental briefing.
We agree with the People that defendant forfeited these claims. Contrary to defendant's contention, his failure to raise the Crawford issue before the trial court is not excused on the ground that such an objection would have been futile. We further conclude that defendant has not met his burden in establishing ineffective assistance of counsel because he has not established that the failure to object to background hearsay was unreasonable, and, with respect to both the background hearsay and the case-specific testimonial hearsay that is the focus of his confrontation clause claim, he has failed to establish prejudice under the test in Strickland v. Washington (1984) 466 U.S. 668, 104 S.Ct. 2052, [80 L.Ed.2d 674] ( Strickland ). In light of the dissent, we further conclude that, even if defendant had not forfeited his Crawford / Sanchez claims, any error in admitting the inadmissible testimony was harmless under Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, [17 L.Ed.2d 705] ( Chapman ).
A. Additional Background
Trial counsel filed two sets of written in limine motions on behalf of defendant. In one of the filings, counsel sought various in limine rulings not specific to the gang evidence (general in limine motions). One such motion in the general in limine motions requested the court to exclude evidence of prior *922 crimes not "specifically noticed by the prosecution,"[7] citing Evidence Code sections 210 (Relevant evidence), 350 (Only relevant evidence is admissible), 352 (Discretion of court to exclude evidence) and 1101 (Evidence of character to prove conduct). In this same motion, trial counsel stated, without analysis: "This evidence would additionally violate defendant's rights to due process and confrontation under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution." Counsel's motion was generic in nature and did not specifically reference the gang expert's anticipated testimony. Nor was the United States Supreme Court's landmark decision in Crawford mentioned.
In a separate filing, defendant's trial counsel requested that the court exclude specific testimony of the prosecution's gang expert (gang-specific in limine motions).[8] In the "Law and Argument" section *180 of this filing, trial counsel argued, among other things,[9] that "the gang expert's opinions regarding the defendant's participation in a gang, the pattern of gang activity, the defendant's knowledge and the defendant's intent are inadmissible because they are hearsay and lack foundation." (Capitalization omitted.) However, this section contained little "hearsay" or "foundation" analysis; nor did it identify *923 any specific testimony (from the preliminary hearing or discovery) that was objectionable on hearsay grounds. Rather, counsel spent four pages discussing case law pertaining to section 186.22, subdivision (a), active participation in a criminal street gang, an offense for which defendant was not charged.[10] As for hearsay and foundation, counsel merely stated: "In assessing the foundation for the opinion of an expert witness, it is fundamental that the opinion cannot be based on unreliable hearsay, speculation, or the mere conclusions of other experts. These rules of evidence apply to a law enforcement witness whom the prosecutor seeks to qualify as a 'gang expert.' " Setting forth a quote purportedly found in three cases, counsel went on to state, " 'Conclusional testimony that gang members have previously engaged in the enumerated offenses, based on nonspecific hearsay and arrest information which does not specify exactly who, when, where and under what circumstances gang crimes were committed, does not constitute substantial evidence.' " As is obvious, the quote pertains to the question of whether in the cited cases there was substantial evidence to support aspects of the gang enhancement. No analysis concerning expected gang expert testimony in the instant case was offered.
Trial counsel's gang-specific in limine motion contained no confrontation clause analysis and did not specifically object to any aspect of the gang expert's anticipated testimony on Crawford grounds. Indeed, again counsel did not even cite Crawford . Nor did counsel cite and discuss the then-evolving case law on the admissibility of expert opinion basis testimony we discuss post .
During oral argument on the in limine motions, defense counsel did not mention the boilerplate confrontation clause claim, *181 the separate hearsay objection, or the generic Evidence Code sections 1101 and 352 objections made in the written in limine motions.[11] Instead, counsel requested that the trial court bifurcate the gang enhancement allegation, contending the testimony about defendant's past would be inflammatory and unduly prejudicial. The trial court, having previously read the prosecution's trial brief, stated that the gang evidence was "inextricably entwined with the very purpose for the murder" as evidence of motive and without the gang evidence, the jury "would not have any context in which to evaluate the mens rea, mental state, *924 of [defendant]." Defense counsel argued that the motive could be proved through the testimony of the witnesses and the video surveillance recording and that the evidence the prosecution planned to admit would do nothing more than make defendant look "dirty." The prosecutor reiterated what he had argued in his trial brief, that the enhancement should not be bifurcated because the gang evidence would prove motive and evidence concerning the motive was "inextricably entwined with the gang evidence." The trial court denied the bifurcation motion, noting that the theory of the case was that this was a gang killing, "the evidence would come in anyway" because it was "cross-admissible," and the probative value outweighed any prejudice.[12]
Regarding the gang expert's testimony, trial counsel also contended that evidence underlying defendant's then-pending separate prosecution for violating section 69, obstructing or resisting an executive officer, should not be admitted. Counsel contended there were no gang overtones associated with that case. The prosecution agreed not to introduce evidence of that matter in its case-in-chief.
Thereafter, the trial court asked trial counsel, "So then on the gang expert, [defense counsel], is there anything else?" Counsel replied there was not. The court then asked, "Anything you want me to decide before he testifies?" Again, counsel said there was not.
In arguing the in limine motions orally, and in a subsequent colloquy concerning the gang expert's testimony,[13] defense counsel never asserted that the evidence of defendant's prior crimes and police contacts should not be introduced through the expert's testimony based on hearsay or confrontation clause grounds. Again, counsel did not cite Crawford . Nor did counsel cite any of the then-evolving case law on the admissibility of expert opinion basis testimony we discuss post . Defendant acknowledges as much on appeal.
B. Crawford and Sanchez
In Crawford , the United States Supreme court held that the admission of testimonial hearsay violates the confrontation clause *182 unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. ( Crawford, supra , 541 U.S. at pp. 53-54, 59, 124 S.Ct. 1354.) However, the court further stated that the confrontation clause does prohibit *925 the admission of testimonial statements for purposes other than establishing the truth of the matter asserted. ( Id . at p. 59, fn. 9, 124 S.Ct. 1354.)
In Sanchez , our high court considered "the degree to which the Crawford rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion," and held that "case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law." ( Sanchez, supra , 63 Cal.4th at p. 670, 204 Cal.Rptr.3d 102, 374 P.3d 320.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." ( Id . at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The Sanchez court further held that some of the hearsay statements in that case were also testimonial and should have been excluded under Crawford . ( Sanchez , at pp. 670-671, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Our high court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate testimonial hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." ( Sanchez , at p. 686, 204 Cal.Rptr.3d 102, 374 P.3d 320, fn. omitted.) In adopting these rules, the Sanchez court disapproved of its pre- Crawford decisions which held that the matters upon which an expert relied as the bases of the expert's opinion were not offered for their truth, and rejected the notion that a limiting instruction coupled with an Evidence Code section 352 balancing analysis was sufficient to allay hearsay and confrontation clause concerns. ( Sanchez , at p. 686, fn. 13, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The Sanchez court specifically disapproved of People v. Gardeley (1996) 14 Cal.4th 605, 618-619, 59 Cal.Rptr.2d 356, 927 P.2d 713 ( Gardeley ) inasmuch as "it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." ( Sanchez , at p. 686, fn. 13, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
C. Forfeiture, Foreseeability, and Futility
We conclude that defendant forfeited the confrontation clause contention he belatedly makes on appeal by failing to make specific objections in the trial court. Requiring a timely, specific objection on confrontation clause grounds in the trial court would not have placed an unreasonable burden on defendant to anticipate an unforeseen change in the law. To the contrary, as we will discuss, the change in the law was foreseeable given the state of the decisional law prior to the introduction of the evidence at trial.
"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on *926 appeal.' [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." ( *183 In re Seaton (2004) 34 Cal.4th 193, 198, 17 Cal.Rptr.3d 633, 95 P.3d 896.) As noted by the United States Supreme Court, states may apply this rule to federal confrontation clause objections. ( Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305, 313, fn. 3, 129 S.Ct. 2527, [174 L.Ed.2d 314, 323, fn. 3] ["The right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections"].) Such a rule can be found in Evidence Code section 353,[14] and our high court has repeatedly noted that a timely and specific objection on confrontation grounds is required to preserve confrontation clause violation theories on appeal. ( People v. Redd (2010) 48 Cal.4th 691, 729, 108 Cal.Rptr.3d 192, 229 P.3d 101, citing Evid. Code, § 353 ; see also People v. D'Arcy (2010) 48 Cal.4th 257, 290, 106 Cal.Rptr.3d 459, 226 P.3d 949 ; People v. Waidla (2000) 22 Cal.4th 690, 726, fn. 8, 94 Cal.Rptr.2d 396, 996 P.2d 46 ; People v. Dennis (1998) 17 Cal.4th 468, 529, 71 Cal.Rptr.2d 680, 950 P.2d 1035 ; People v. Alvarez (1996) 14 Cal.4th 155, 186, 58 Cal.Rptr.2d 385, 926 P.2d 365 ( Alvarez ).) The requirement of an objection on specific grounds "gives both parties the opportunity to address the admissibility of the evidence so the trial court can make an informed ruling, and creates a record for appellate review." ( People v. Davis (2008) 168 Cal.App.4th 617, 627, 86 Cal.Rptr.3d 55 ( Davis ).) Making the objection in the trial court also gives the proponent of the evidence an opportunity to cure the defect in the evidence if possible ( People v. Pearson (2013) 56 Cal.4th 393, 438, 154 Cal.Rptr.3d 541, 297 P.3d 793 ( Pearson ) ), or forgo introducing all or some of the evidence. In other words, a specific objection gives the proponent of the evidence the opportunity to take "steps designed to minimize the prospect of reversal." ( People v. Morris (1991) 53 Cal.3d 152, 187-188, 279 Cal.Rptr. 720, 807 P.2d 949 ( Morris ), disapproved on other grounds in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.) " '[I]t is unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' " ( Davis , at p. 627, 86 Cal.Rptr.3d 55, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444-445.)
Here, the boilerplate claim in trial counsel's general in limine motions that unspecified other crimes evidence not specifically noticed by the prosecution would violate defendant's rights to due process and confrontation under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution *927 and article I, sections 7 and 15 of the California Constitution was insufficient to preserve the more specific Crawford -based argument that defendant makes now-that hearsay used by the gang expert to explain his opinion regarding defendant's gang membership, as well as the hearsay concerning the predicate felonies, consisted of testimonial statements admitted for the truth. The motion made in the trial court here was similar to the motion made in Alvarez, supra , 14 Cal.4th 155, 58 Cal.Rptr.2d 385, 926 P.2d 365. There, the defendant made a "bare reference" to the confrontation clause in his moving papers, and the Alvarez court held this was insufficient to preserve the claim for review. ( Alvarez , at p. 186, 58 Cal.Rptr.2d 385, 926 P.2d 365.) The court *184 observed, "[t]here was neither a 'specific' nor 'timely' objection below predicated on the Sixth Amendment's confrontation clause. True, there was a bare reference to the 'confrontation rule' (capitalization deleted) in moving papers submitted by defendant. But that was all. And that was not enough." ( Alvarez , at p. 186, 58 Cal.Rptr.2d 385, 926 P.2d 365.)
Similarly, defendant's bare reference to the confrontation clause in his general in limine motions, without reference to the gang expert testimony, is not enough here. A specific objection identifying a specific constitutional theory is required. (See People v. Williams (2010) 49 Cal.4th 405, 435, 111 Cal.Rptr.3d 589, 233 P.3d 1000 [a defendant ordinarily forfeits specific involuntariness theories regarding a defendant's statements to law enforcement that were not raised below]; People v. Ray (1996) 13 Cal.4th 313, 339, 52 Cal.Rptr.2d 296, 914 P.2d 846 [claim of delay in Mirandizing the defendant did not preserve for review a claim that an offer of benefit rendered the defendant's statement involuntary; "the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings"].)
On appeal, defendant does not claim trial counsel's boilerplate objection sufficed to preserve his confrontation clause arguments; he acknowledges that that the claim was not raised in the trial court and that key cases we discuss post concerning the emerging law on testimonial hearsay were not cited by trial counsel. Instead, defendant contends that he has not forfeited his claim because any objection would have been futile under case law as it existed at the time. Defendant points out that the decisional law at the time provided that an expert witness may testify as to the material that forms the basis of his or her opinion, even if it would otherwise be inadmissible. ( Gardeley, supra , 14 Cal.4th at pp. 618-619, 59 Cal.Rptr.2d 356, 927 P.2d 713 ; People v. Thomas (2005) 130 Cal.App.4th 1202, 1209-1210, 30 Cal.Rptr.3d 582 ( Thomas ).) Defendant further notes that decisional law also held that because such testimony is not offered for the truth of the matter, but rather to explain the gang expert's testimony, it does not violate the confrontation clause. ( Thomas , at pp. 1209-1210, 30 Cal.Rptr.3d 582.) According to defendant, any attempt to register a specific confrontation clause objection would have been futile and, as a consequence, the failure to do so should be excused.
*928 However, it has long been the rule that reviewing courts excuse a failure to object when requiring the objection " 'would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal.' " ( People v. De Santiago (1969) 71 Cal.2d 18, 23, 76 Cal.Rptr. 809, 453 P.2d 353, italics added ( De Santiago ), quoting People v. Kitchens (1956) 46 Cal.2d 260, 263, 294 P.2d 17 ( Kitchens ); accord People v. Rangel (2016) 62 Cal.4th 1192, 1216, 200 Cal.Rptr.3d 265, 367 P.3d 649 ( Rangel ); People v. Edwards (2013) 57 Cal.4th 658, 704-705, 161 Cal.Rptr.3d 191, 306 P.3d 1049 ( Edwards ).)
The foreseeability rule was recently discussed by our high court in Rangel , supra , 62 Cal.4th 1192, 200 Cal.Rptr.3d 265, 367 P.3d 649. There, the court addressed the question of whether a confrontation clause objection grounded on Crawford was forfeited. The defendant objected on appeal to the admissibility of statements under the adoptive admissions hearsay exception on confrontation clause grounds. ( *185 Rangel , at p. 1215, 200 Cal.Rptr.3d 265, 367 P.3d 649.) Before the trial was conducted in 1998, the California Supreme Court had squarely held that statements qualifying for admissibility under the adoptive admissions exception were admissible over a confrontation clause objection based on the analysis in Ohio v. Roberts (1980) 448 U.S. 56, 65-66, 100 S.Ct. 2531, [65 L.Ed.2d 597, 607-608]. ( Rangel , at p. 1215, 200 Cal.Rptr.3d 265, 367 P.3d 649.) The Rangel court noted that Crawford is " 'flatly inconsistent' " with that prior governing precedent and reasoned that the failure to object on confrontation clause grounds was excusable because the " ' "governing law at the time ... afforded scant grounds for objection." ' " ( Rangel , at p. 1215, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics added; see also Edwards , supra , 57 Cal.4th at pp. 704-705, 161 Cal.Rptr.3d 191, 306 P.3d 1049 [given the existing case law, "defendant's failure to object [on confrontation clause grounds] during his 1996 trial 'was excusable, since governing law at the time ... afforded scant grounds for objection' " (italics added) ].) Citing other California Supreme court cases holding that trial counsel "could not have anticipated Crawford 's sweeping changes to federal confrontation clause case law," and that Crawford represented " 'an unforeseen change in the law "that competent and knowledgeable counsel reasonably could [not] have been expected to have anticipate[ ]" at defendant's [pre- Crawford ] trial,' " the Rangel court held that the defendant in that case did not forfeit a Crawford challenge. ( Rangel , at pp. 1215-1216, 200 Cal.Rptr.3d 265, 367 P.3d 649, citing People v. Chism (2014) 58 Cal.4th 1266, 1288, fn. 8, 171 Cal.Rptr.3d 347, 324 P.3d 183, & Pearson, supra, 56 Cal.4th at p. 462, 154 Cal.Rptr.3d 541, 297 P.3d 793.) The Rangel court concluded its discussion on the doctrine of forfeiture by emphasizing that "the relevant question is whether requiring ... an objection ' " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law." ' " ' " ( Rangel , at p. 1217, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics *929 added.) It then added, "[b]ecause that standard is satisfied here, we conclude that defendant has not forfeited his Crawford claim." ( Rangel , at p. 1217, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics added.)
Here, that standard was not satisfied and consequently, the failure to object is not excused. As we shall discuss, the grounds for objecting were far from "scant." Rather, the legal writing was on the wall and key changes in the law discussed in Sanchez were not unforeseeable . Thus, we conclude that the answer to the relevant question of whether requiring the objection would have placed an unreasonable burden on defendant to anticipate an unforeseen change in the law is no, it would not. Instead of relying on boilerplate motions with vague objections not specific to the case, trial counsel was required to make objections on specific grounds related to the foreseeable changes in confrontation clause law based on the decisional law in existence at the time.
We are not the first among the Courts of Appeal to reach this conclusion since our high court decided Sanchez . The foreseeability standard was recently applied to a Crawford / Sanchez claim similar to that in the instant case by our colleagues in Division Two, of the Fourth Appellate District in People v. Perez (2018) 22 Cal.App.5th 201, 231 Cal.Rptr.3d 316 ( Perez ). Like us, that court held that the defendant forfeited any objection to a gang expert's testimony to case-specific hearsay, which is inadmissible under Sanchez , by failing to make the appropriate objection in the trial court. (Perez , at *2-3, *6, citing *186 Edwards , supra , 57 Cal.4th at p. 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049.) Like us, the court concluded that, for the most part,[15] the change effected by Sanchez was foreseeable. (Perez , at *17.)
At the time of defendant's trial, issues involving the confrontation clause-specifically the admission of hearsay evidence as the bases for experts' opinions and whether that evidence is admitted for its truth-could no longer be considered settled as defendant suggests. It is true that in 1996, our high court in Gardeley held that experts may relate to the jury hearsay statements that were part of the basis of their opinion when such information was the type of information reasonably relied upon by experts in the field. ( Gardeley, supra , 14 Cal.4th at pp. 618-619, 59 Cal.Rptr.2d 356, 927 P.2d 713.) However, Gardeley , which predated Crawford by eight years, did not address the confrontation clause implications of the admission of such hearsay and as of the time of defendant's trial, the California Supreme Court had never expressly addressed whether hearsay *930 statements relied upon by a gang expert were admissible over a confrontation clause objection. However, as defendant points out, the Court of Appeal in Thomas, supra , 130 Cal.App.4th at pages 1208-1210, 30 Cal.Rptr.3d 582, did.
Addressing the confrontation clause question not presented in Gardeley , the Thomas court reasoned that Crawford did not undermine the established rule that gang experts can testify about the information and sources upon which they rely in forming their opinions. ( Thomas, supra , 130 Cal.App.4th at p. 1210, 30 Cal.Rptr.3d 582.) This was so, according to the Thomas court, "because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents ; they are examined to assess the weight of the expert's opinion. Crawford itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " ( Thomas , at p. 1210, 30 Cal.Rptr.3d 582, italics added.) Several cases subsequently cited Thoma s for this proposition in varying contexts. (See People v. Sisneros (2009) 174 Cal.App.4th 142, 153-154, 94 Cal.Rptr.3d 98 [noting the holding from Thomas in the context of a gang expert testifying about witness intimidation by the gang and the expert's consideration of the fact that an accessory refused to take the oath and testify in front of the jury; the court observed that the accessory "never offered any statement, much less a testimonial statement," and rejected the confrontation clause claim on this basis]; People v. Ramirez (2007) 153 Cal.App.4th 1422, 1427, 64 Cal.Rptr.3d 96 [rejecting defendant's confrontation clause claim concerning gang expert's testimony about predicate offenses based on Thomas ]; People v. Cooper (2007) 148 Cal.App.4th 731, 746-747, 56 Cal.Rptr.3d 6 [applying Thomas to testimony of a mental health expert]; People v. Fulcher (2006) 136 Cal.App.4th 41, 57, 38 Cal.Rptr.3d 702 [applying Thomas to testimony of a sexually violent predator expert].)
But the reasoning in Thomas was later roundly criticized in People v. Hill (2011) 191 Cal.App.4th 1104, 1127-1137, 120 Cal.Rptr.3d 251 ( Hill ). The Hill court noted that, "[c]entral to the reasoning in *187 Gardeley and Thomas is the implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements." ( Hill , at pp. 1129-1130, 120 Cal.Rptr.3d 251.) It further noted that the California Supreme Court decisions concluding that basis testimony is not admitted for the truth were decided before Crawford , and since Crawford there has been a "heightened concern regarding an expert's disclosure of basis evidence consisting of out-of-court statements." ( Hill , at p. 1131, 120 Cal.Rptr.3d 251.) Given the then-existing law, the Hill court was compelled to follow Gardeley . ( Hill , at pp. 1127, 1132, 120 Cal.Rptr.3d 251.) It nevertheless observed: "There is some reason to believe that the California Supreme Court may be prepared to recognize the logical error in Gardeley and Thomas ." ( Hill , at p. 1131, fn. 18, 120 Cal.Rptr.3d 251.) Hill predated defendant's trial by over two years. *931 In defendant's original briefing on appeal, he relied on Williams v. Illinois (2012) 567 U.S. 50, 132 S.Ct. 2221, [183 L.Ed.2d 89] ( Williams ) in support of his confrontation clause claim, but his reliance on that case is misplaced because it only helps illustrate why much of the opinion in Sanchez concerning expert witness basis testimony was foreseeable and that it was not futile to make the objection he claims was not forfeited here. In Williams , Cellmark laboratory produced a DNA profile from semen recovered from a rape victim which was purported to be an accurate profile of an unknown donor ( Williams , at p. 59, 132 S.Ct. 2221 ), but nobody from Cellmark testified at trial about the analysis that resulted in the profile. A prosecution expert testified she compared the defendant's known DNA profile to the Cellmark profile and opined that the two matched. The defendant objected on confrontation clause grounds. ( Id. at p. 62, 132 S.Ct. 2221.) Five justices, consisting of the four-justice plurality and Justice Thomas concurring, concluded that there was no confrontation clause violation because the report was nontestimonial.[16] However, on the question of whether the Cellmark report was offered for the truth of the statements contained therein, five justices of the high court agreed that they were (Justice Thomas in his concurring opinion and Justice Kagan in her dissent, in which Justices Scalia, Ginsburg, and Sotomayor joined). (See Williams , at pp. 108-109, 132 S.Ct. 2221 (conc. opn. of Thomas, J.); id . at pp. 129-130, 132 S.Ct. 2221 (dis. opn. of Kagan, J.).) Justice Kagan reasoned that when an expert repeats an out-of-court statement as the basis for a conclusion, the statement's utility is then dependent on its truth. ( Id . at p. 126, 132 S.Ct. 2221 (dis. opn. of Kagan, J.).) "If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies." ( Ibid . ) Justice Thomas noted that the validity of the expert opinion "ultimately turned on the truth of Cellmark's statements." ( Id . at p. 108, 132 S.Ct. 2221 (conc. opn. of Thomas, J.).) Williams was decided nearly a year before defendant's trial.
Defendant also relied on People v. Dungo (2012) 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442 ( Dungo ) in his original briefing for the proposition that statements relied upon by experts are, in fact, *188 admitted for their truth and that the California rule permitting experts to convey otherwise inadmissible hearsay for the purpose of explaining their opinions was no longer viable. Like Williams , the reasoning and holding in Dungo demonstrates why much of Sanchez was foreseeable and why it would not have been futile to make the objection defendant asserts on appeal. The Dungo court discussed Williams extensively and specifically noted that five justices *932 of the high court rejected the notion that the Cellmark report was not introduced for the truth of the matter asserted therein. ( Dungo , at p. 635 & fn. 3, 147 Cal.Rptr.3d 527, 286 P.3d 442.) Six justices in Dungo agreed, signing opinions indicating that statements admitted to explain an expert's opinion are admitted for their truth. (See id . at pp. 627, 147 Cal.Rptr.3d 527, 286 P.3d 442 (conc. opn. of Werdegar, J.); id . at p. 635, fn. 3, 147 Cal.Rptr.3d 527, 286 P.3d 442 (dis. opn. of Corrigan, J.).) However, the Dungo court concluded the evidence upon which the expert relied-the autopsy report of another pathologist-did not violate the confrontation clause because the report was not testimonial. ( Dungo , at pp. 620-621, 147 Cal.Rptr.3d 527, 286 P.3d 442.) The Dungo court acknowledged that the United States Supreme Court had not agreed on a definition of "testimonial," but further noted "two critical components" had emerged. ( Id . at p. 619, 147 Cal.Rptr.3d 527, 286 P.3d 442.) "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." ( Ibid . ) The Dungo court reasoned that the autopsy report was not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation clause, and criminal prosecution was not the primary purpose for recording the facts in the report. ( Dungo , at pp. 620-621, 147 Cal.Rptr.3d 527, 286 P.3d 442.) Thus, the Dungo court settled on an approach to determine when a statement is testimonial, and six of our high court's members disagreed with the notion that hearsay statements admitted to explain an expert's opinion are not admitted for their truth. Dungo was decided seven months before defendant's trial.
Defendant also cited People v. Mercado (2013) 216 Cal.App.4th 67, 156 Cal.Rptr.3d 804 ( Mercado ) in his original briefing in support of his confrontation clause claim. Like Williams and Dungo , Mercado shows why Sanchez was foreseeable and an objection in the trial court was not futile. In Mercado , a pathologist based part of his expert opinion on a witness statement in a coroner's report. ( Mercado , at pp. 82-84, 156 Cal.Rptr.3d 804.) Following Williams and Dungo , the Mercado court concluded that the statements did not violate the confrontation clause because they failed both the formality and primary purpose tests and thus did not qualify as testimonial. ( Mercado , at p. 90, 156 Cal.Rptr.3d 804.) However, the Mercado court also noted that " '[A] five justice majority of the high court and at least six of the seven justices on the California Supreme Court appear to agree that, for purposes of the confrontation clause, out-of-court statements admitted as basis evidence during expert testimony are admitted for their truth if treated as factual by the expert and, thus, implicate confrontation rights if the statements are testimonial.' " ( Mercado , at p. 89, fn. 6, 156 Cal.Rptr.3d 804.) Mercado was published two days before the in limine motions were argued in defendant's trial, and nine days before the gang expert's trial testimony.
Williams , Dungo , and Mercado all point to the inescapable conclusion that the confrontation clause analysis had changed *189 since Gardeley , Thomas , and Hill , and that it was going to continue to change. Well before defendant's *933 in limine motions were filed and argued, five justices of the United States Supreme Court and six justices of the California Supreme court agreed that hearsay statements upon which experts base their opinions are admitted for the truth. Additionally, our Supreme Court in Dungo looked to the formality in which the statements were made and the primary purpose of those statements to determine whether such hearsay is testimonial. ( Dungo, supra , 55 Cal.4th at pp. 620-621, 147 Cal.Rptr.3d 527, 286 P.3d 442.) The Mercado court did the same. ( Mercado , supra , 216 Cal.App.4th at p. 90, 156 Cal.Rptr.3d 804.)
Thus, by the time of defendant's in limine motion and well before the gang expert here testified, it was reasonably foreseeable that our state's high court would hold: (1) statements upon which a gang expert relies in forming his or her opinion are offered for the truth of the matter, a viewpoint that is directly contrary to the Thomas court's observation that allowing the jury to hear such statements did not violate the confrontation clause because such statements are "not elicited for the truth of their contents" ( Thomas , supra , 130 Cal.App.4th at p. 1210, 30 Cal.Rptr.3d 582 ); (2) the admission of such statements violates the confrontation clause if the statements are testimonial; and (3) whether a statement is testimonial turns on (a) the formality or solemnity of the circumstances in which it was made, and (b) whether the primary purpose for the statement "pertains in some fashion to a criminal prosecution." ( Dungo, supra , 55 Cal.4th at p. 619, 147 Cal.Rptr.3d 527, 286 P.3d 442 ; Mercado, supra , 216 Cal.App.4th at p. 90, 156 Cal.Rptr.3d 804.) These criteria for determining whether a statement is testimonial did not exist when Thomas was decided. Because the hearsay statements upon which the gang expert here relied in rendering an opinion about defendant's gang affiliation may very well have had the requisite formality and criminal prosecution may have been the primary purpose of those statements, we cannot agree a Crawford -based objection on the grounds that the evidence was testimonial hearsay and violated the confrontation clause would have been futile. Trial counsel would not have borne an unreasonable burden by making the objection citing Crawford , Williams , Dungo and Mercado as appellate counsel did in the original briefing in this case before Sanchez was issued. To the contrary, as the court in Perez observed, these cases "alerted competent and knowledgeable counsel to the need to object to [expert basis testimony] on hearsay and Crawford grounds. [These cases] also meant that such objections would not have been futile." (Perez, supra , 22 Cal.App.5th 201, 231 Cal.Rptr.3d 316 [2018 Cal.App. Lexis at *16].)
Had defendant made the objection in the trial court, the prosecution would have been on notice of the need to establish the non-hearsay, non-testimonial nature of the statements upon which the gang expert relied if it could, or perhaps determine whether the expert could base his opinion solely on matters that were not hearsay and not testimonial. Indeed, faced with the objection defendant makes here on appeal along with citations to Crawford , Williams , Dungo , and Mercado , the prosecutor could have decided it prudent *934 to forgo some or all testimony about the prior police contact events the expert related to the jury, or attempt to bring in witnesses who could competently testify to relevant parts of the more pertinent events. As a result of the failure to make specific objections, the People and the trial court were deprived of the opportunity to address the *190 issue. As we have noted, " 'it is unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' " ( Davis , supra , 168 Cal.App.4th at p. 627, 86 Cal.Rptr.3d 55.)
Defendant argues that he should be excused from failing to object. He asserts that any objection would have been futile because Gardeley and Thomas were binding on the trial court. He relies essentially on two cases, Kitchens, supra , 46 Cal.2d at pages 262-263, 294 P.2d 17, and a footnote in People v. Sandoval (2007) 41 Cal.4th 825, 62 Cal.Rptr.3d 588, 161 P.3d 1146 ( Sandoval ). Neither case helps defendant because neither case involves changes in the law that were foreseeable based on the state of the decisional law in existence at the time.
In Kitchens , the defendant contended on appeal that drug evidence was obtained during an illegal search, but his case was tried when illegally obtained evidence was admissible, and the search was not challenged in the trial court. ( Kitchens, supra , 46 Cal.2d at p. 262, 294 P.2d 17.) Our high court held that, under the circumstances, the traditional rule prohibiting review on appeal of the admissibility of evidence where no objection was made in the trial court should not apply to appeals in cases tried before the California Supreme Court's decision excluding illegally obtained evidence. ( Ibid . ) The court reasoned: "A contrary holding would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal." ( Id . at p. 263, 294 P.2d 17.) The court observed that, in view of its prior decisions, an objection would have been futile and the law does not require idle acts. ( Ibid . )
In Sandoval , the defendant contended on appeal that the upper term sentence imposed by the trial court violated her constitutional right to a jury trial as explained in Cunningham v. California (2007) 549 U.S. 270, 127 S.Ct. 856, [166 L.Ed.2d 856]. ( Sandoval, supra , 41 Cal.4th at p. 831, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) In Cunningham , the high court held that California's determinate sentencing law (DSL) violated the defendant's right to a jury trial by assigning to the trial judge, rather than to the jury, the authority to find facts supporting imposition of upper term sentences. ( Cunningham , at pp. 274-275, 127 S.Ct. 856.) Prior to Cunningham , in People v. Black (2005) 35 Cal.4th 1238, 1244, 29 Cal.Rptr.3d 740, 113 P.3d 534 ( Black I ), our high court had held that the DSL did not violate *935 the right to jury trial, rejecting application of Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531, [159 L.Ed.2d 403] to the DSL. The People argued in Sandoval that the defendant forfeited her jury trial right claim by failing to object to the sentencing proceedings. ( Sandoval , at p. 837, fn. 4, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) The Sandoval court noted in a footnote that a request for a jury trial on the aggravating circumstances would have been futile because Black I was binding on the lower courts until overruled by the high court. ( Sandoval , at p. 837, fn. 4, 62 Cal.Rptr.3d 588, 161 P.3d 1146.)
But the situation presented here is different from Sandoval . First, unlike in Black I where the California Supreme Court previously had squarely addressed the constitutional objection at issue, our high court had not yet addressed the constitutionality of admitting gang expert basis testimony when faced with a confrontation clause objection. As we noted, Gardeley did not address the constitutional implications of expert opinion basis testimony.
*191 Second, although Thomas and other Court of Appeal cases had held that admission of hearsay statements upon which experts rely in forming their opinions did not violate the confrontation clause on the theory that such statements are not admitted for the truth, more recently, our high court had specifically addressed expert opinion basis testimony in Dungo and six justices agreed that such testimony was indeed admitted for the truth of the matter.
In referencing the futility rule in its footnote, the Sandoval court cited People v. Welch (1993) 5 Cal.4th 228, 19 Cal.Rptr.2d 520, 851 P.2d 802 ( Welch ). ( Sandoval, supra , 41 Cal.4th at p. 837, fn. 4, 62 Cal.Rptr.3d 588, 161 P.3d 1146.) The defendant in Welch contested on appeal the reasonableness of probation conditions. ( Welch , at p. 230, 19 Cal.Rptr.2d 520, 851 P.2d 802.) An established line of Court of Appeal decisions had held a defendant was not required to object in the trial court to preserve such a contention on appeal. ( Id . at pp. 231-233, 19 Cal.Rptr.2d 520, 851 P.2d 802.) The Welch court abolished this rule, holding that an objection in the trial court to probation conditions is required, and disapproved of the contrary Court of Appeal decisions. ( Id . at pp. 234-235, 237, 19 Cal.Rptr.2d 520, 851 P.2d 802.) But the Welch court declined to apply the rule to the defendant. ( Id . at p. 237, 19 Cal.Rptr.2d 520, 851 P.2d 802.) The court noted that "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence." ( Ibid ., italics added.) The court reasoned that, by the same token, "[i]t would be unfair to effectively bar any review of defendant's claims where the rule requiring their preservation in the trial court was adopted in the context of her own appeal." ( Id . at p. 238, 19 Cal.Rptr.2d 520, 851 P.2d 802.)
Kitchens , Sandoval , and Welch have one thing in common that made application of the futility rule appropriate in those cases-the law regarding the specific objection at issue was settled prior to the change in the law, and *936 the change in the law was unforeseeable based on the existing decisional law. However, based on Rangel , Edwards , De Santiago , and Perez , we must look first to whether the change in the law was foreseeable based on the state of the law at the time an objection could have been made before we can excuse the failure to object on grounds of futility. If futility as that term is used by defendant would excuse the failure to object without regard to foreseeable changes in the law, our high court's decisions in Rangel and the earlier cases would have simply held that the objections in those cases would have been futile without mentioning foreseeability or excusing the failure to object when the " ' "governing law at the time ... afforded scant grounds for objection." ' " ( Rangel, supra , 62 Cal.4th at p. 1215, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics added, quoting Edwards, supra , 57 Cal.4th at p. 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049.) Instead, as we have noted, our high court has said the relevant question is whether requiring defense counsel to raise an objection " ' " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law." ' " ' " ( Rangel , at p. 1217, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics added, quoting Edwards , at p. 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049.)
Indeed, when there is a reasonably foreseeable change in the law, it can hardly be said that an objection based on decisional law from which the change will result is futile or that such an objection would be an idle act. Even if the trial court is bound to follow previous precedent, it may exercise its discretion differently when considering *192 the implications of more recent developments in the decisional law. Here, this may have resulted in the trial court giving greater scrutiny to the number and nature of defendant's previous contacts related to the jury by the prosecution's gang expert.[17] Moreover, making a specific objection to a specific body of evidence should result in the creation of a better record. And with a better record, a defendant's chances of prevailing on appeal may be enhanced on the issue of evidentiary error and on the determination of whether such error is harmless. (See People v. Ochoa (2017) 7 Cal.App.5th 575, 584, 212 Cal.Rptr.3d 703 ( Ochoa ) [defendant's confrontation clause argument rejected on appeal because defendant's failure to object to the expert's testimony on confrontation clause grounds resulted in an "undeveloped record" about the testimonial nature of the statements upon which the prosecutor's gang expert relied].) *937 Furthermore, as we note post , when an evidentiary error is forfeited and an ineffective assistance of counsel claim has been made, we apply the less burdensome Strickland standard for prejudice instead of the stricter Chapman harmless error standard applicable to evidentiary error based on constitutional claims.
The dissent rejects our analysis, reasoning that foreseeability of changes in the law is not the test for forfeiture and asserting that the Rangel court never mentions such a rule. (Dis. opn., post , at p. 212.) We respectfully disagree. As we have noted, the Rangel court referred to unforeseeability as a "standard," stating "the relevant question is whether requiring defense counsel to raise an objection ' " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law," ' " ' " and then concluding, "[b]ecause that standard is satisfied here, we conclude that defendant has not forfeited his Crawford claim." ( Rangel, supra , 62 Cal.4th at p. 1217, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics added.)
The dissent relies upon People v. Gallardo (2017) 4 Cal.5th 120, 226 Cal.Rptr.3d 379, 407 P.3d 55 ( Gallardo ) in an effort to demonstrate that foreseeability of changes in the law is not the relevant test for forfeiture. But Gallardo suggests otherwise. In Gallardo , our high court disapproved of the rule in People v. McGee (2006) 38 Cal.4th 682, 42 Cal.Rptr.3d 899, 133 P.3d 1054 ( McGee ), allowing trial courts to review a defendant's record of conviction to determine whether a prior conviction qualifies as a serious felony offense for purposes of recidivist enhancements. ( Gallardo , at p. 124, 226 Cal.Rptr.3d 379, 407 P.3d 55.) The Gallardo court reasoned that Descamps v. United States (2013) 570 U.S. 254, 133 S.Ct. 2276, [186 L.Ed.2d 438] ( Descamps ), clarified that when added punishment is imposed based on findings of fact underlying the prior conviction, the Sixth Amendment requires that a jury, not the court, determine *193 whether the prior conviction qualifies. ( Gallardo , at p. 124, 226 Cal.Rptr.3d 379, 407 P.3d 55.) The People had argued that defendant's constitutional claim was forfeited, noting that Descamps was decided prior to the defendant's sentencing. The Gallardo court noted the foreseeability rule in prior California Supreme Court cases we discussed ante . The Gallardo court wrote: "We have previously ' "excused ... failure[s] to object [on a particular ground] where to require defense counsel to raise [that] objection 'would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule ... would be changed on appeal.' " ' " ( Gallardo , at p. 127, 226 Cal.Rptr.3d 379, 407 P.3d 55, italics added.) With that standard in mind, and noting that the Descamps court had discussed Sixth Amendment principles "only en route to" interpreting the federal statute at issue, the Gallardo court stated that it was "at least questionable whether defendant should be made to bear the burden of anticipating potential changes in the law based on the reasoning of a United States Supreme Court opinion addressed to the proper interpretation of a federal statute not at issue here ." ( Gallardo , at p. 128, 226 Cal.Rptr.3d 379, 407 P.3d 55, italics added.) Thus, *938 the Gallardo court did not conclude foreseeability is irrelevant, as the dissent seems to imply. Rather, it reaffirmed that foreseeability is the test. The court merely suggested, without deciding, that the rejection of McGee might not have been foreseeable based on the opinion in Descamps and the issue addressed therein.[18]
Here, unlike in Gallardo , the change in the law was foreseeable based not only the reasoning of five of the nine justices of the United States Supreme Court, but also on opinions signed off on by six of the seven justices on our high court. Added as components of the foreseeability equation here are the observations of the court in Mercado and the court's earlier prediction in Hill that "[t]here is some reason to believe that the California Supreme Court may be prepared to recognize the logical error in Gardeley and Thomas ." ( Hill, supra , 191 Cal.App.4th at p. 1131, fn. 18, 120 Cal.Rptr.3d 251.)
The dissent actually appears to concede that the change in the law here was foreseeable, acknowledging that " Williams and Dungo suggested that if called upon to decide the issue, a majority of justices on the United States Supreme Court and our Supreme Court, as then constituted , would likely find that the extrajudicial basis of an expert's opinion is necessarily considered for its truth for confrontation purposes." (Dis. opn., post , at p. 213.) However, the dissent contends that because there was no indication that either court would reach the issue in the foreseeable future at the time of defendant's trial, somehow the change in the law was therefore unforeseeable for forfeiture purposes. (Dis. opn., post , p. 213.) We disagree, but also note that the timing of when the issue would be reached seems beside the point. What is relevant is the foreseeability of how the court would decide the issue whenever it was presented. As we see it, if Sanchez was never decided, the instant case could have been the case upon which our high court reached the issue.
*194 Also, while it could not be foreseen with precision that all six justices in Dungo would still be sitting when the issue percolated up to our high court, the objection should have been made nevertheless. Given the underlying reasoning of the Dungo justices, it was reasonably foreseeable that whoever was on our high court would adopt the more modern thinking of the justices in Williams . And as Justice Kagan pointed out, the Williams justices were not alone in rejecting the theory that hearsay basis evidence is not admitted for the truth. The "principal modern treatise on evidence," Justice Kagan noted, had called "the idea that ... 'basis evidence' comes in not for its truth, but only to help the factfinder evaluate an expert's opinion 'very weak,' 'factually *939 implausible,' 'nonsense,' and 'sheer fiction.' " ( Williams, supra , 567 U.S. at pp. 126-127, 132 S.Ct. 2221 (dis. opn. of Kagan, J.), citing D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence (2d ed. 2011) § 4.10.1, pp. 196-197; id. (Supp. 2012) § 4.11.6, p. 24.)
The dissent states that our invocation of the forfeiture rule is premised on the requirement that a defendant create a record in support of an objection for use on appeal and suggests that the record here would have been the same if defendant had objected. (Dis. opn., post , at pp. 209, 211-12.) Again, we respectfully disagree. It is true that a defendant's failure to object can result in an undeveloped record. We also note again that one court has already rejected a defendant's confrontation clause objection because he failed to make the objection in the trial court, resulting in an undeveloped record as to the testimonial nature (solemnity and primary purpose) of the hearsay statements. ( Ochoa, supra , 7 Cal.App.5th at p. 584, 212 Cal.Rptr.3d 703 [noting that "[h]ad defendant lodged contemporaneous objections during trial, the People, as the proponent of the evidence, would have had the burden to show the challenged testimony did not relate testimonial hearsay"].) Nevertheless, underlying our decision are the other purposes of the forfeiture rule and Evidence Code section 353 : giving the trial court an opportunity to make an informed decision to avoid prejudice ( Davis, supra , 168 Cal.App.4th at p. 627, 86 Cal.Rptr.3d 55 ), and giving the proponent of the evidence the opportunity to cure the defect or take other steps designed to minimize the prospect of reversal. ( Pearson, supra, 56 Cal.4th at p. 438, 154 Cal.Rptr.3d 541, 297 P.3d 793 ; Morris, supra , 53 Cal.3d at pp. 187-188, 279 Cal.Rptr. 720, 807 P.2d 949.)
We also disagree with the dissent's conclusion that the record would have been the same if defendant objected. (Dis. opn., post , at pp. 209, 211-12.) In our view, the record is enhanced by timely, specific objections to each piece of objectionable testimony, highlighting trial counsel's position that the evidence is inadmissible testimonial hearsay, even if the prosecution does not provide rebuttal. The dissent is also critical of our observation that the trial court might have exercised its discretion differently had specific objections been made to specific evidence, and Williams , Dungo , and Mercado been cited. (Dis. opn. post , at p. 211-12.) While the dissent dismisses our observation as speculation, we see this as the role of the trial court in the exercise of its discretion. As our high court has noted in a case cited by the dissent, the requirement to make a specific and timely objection "allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice." ( Morris , supra , 53 Cal.3d at pp. 187-188, 279 Cal.Rptr. 720, 807 P.2d 949, italics added; see also fn. 17, ante .)
Defendant and the dissent note that some courts have rejected the forfeiture argument made here on the grounds that *195 any objection would have been futile. They cite a footnote in *940 People v. Meraz (2016) 6 Cal.App.5th 1162, 212 Cal.Rptr.3d 81, review granted March 22, 2017, S239442 ( Meraz ), where that court wrote: "Any objection would likely have been futile because the trial court was bound to follow pre- Sanchez decisions holding expert 'basis' evidence does not violate the confrontation clause." ( Meraz , at p. 1170, fn. 7, 212 Cal.Rptr.3d 81, review granted.) However, there is no indication the Meraz court considered our Supreme Court's opinions concerning foreseeability.
Defendant and the dissent also rely upon People v. Jeffrey G . (2017) 13 Cal.App.5th 501, 221 Cal.Rptr.3d 88, where the court rejected the People's forfeiture contention related to a Crawford confrontation clause claim concerning mental health experts who testified during a hearing on a petition for transfer from a state hospital to a conditional release program. ( Jeffrey G ., at pp. 503-504, 508, 221 Cal.Rptr.3d 88.) Sanchez was issued a short time after the transfer hearing. ( Jeffrey G ., at p. 504, 221 Cal.Rptr.3d 88.) In response to the People's argument that trial counsel should have anticipated the change Sanchez brought based on the "Supreme Court's docket" and "developments in the law ... from other jurisdictions," the Jeffrey G. court stated, "[w]e decline to require such prescience." ( Jeffrey G ., at p. 508, 221 Cal.Rptr.3d 88, fn. omitted.) We respectfully disagree. First, the Jeffrey G . court made no reference to Dungo or the fact that six California Supreme Court justices had rejected the not-for-the-truth theory. Nor did the Jeffrey G . court note the court's observations in Hill and Mercado . Rangel was not discussed either, so the Jeffrey G. court never considered the "the relevant question" of whether requiring defense counsel to raise an objection would have placed an unreasonable burden on defendants to anticipate unforeseen changes in the law. ( Rangel, supra , 62 Cal.4th at 1217, 200 Cal.Rptr.3d 265, 367 P.3d 649.)
In our view, Rangel and the other cases stating that failure to object is excused where requiring an objection would place an "unreasonable burden on defendants to anticipate unforeseen changes in the law" necessarily contemplates the inverse, requiring defendants to make timely and specific objections where the change in law is reasonably foreseeable. Such a requirement is not onerous and serves the purposes of requiring specific and timely objections we have discussed. When one considers Dungo , and Mercado , and the opinions in Williams and the authorities cited therein, the change Sanchez brought was foreseeable and making the objection did not present an unreasonable burden.
We conclude the failure to object is excused when the objection " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law." ' " ( Rangel, supra , 62 Cal.4th at p. 1217, 200 Cal.Rptr.3d 265, 367 P.3d 649, italics added; Edwards, supra , 57 Cal.4th at p. 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049 ; Perez, supra , 22 Cal.App.5th 201, 231 Cal.Rptr.3d 316 [2018 Cal.App. Lexis at *6].) In determining whether the significance of a change in the decisional law excuses counsel's failure to object at trial, we consider the state of the decisional law as it would have appeared to competent and *941 knowledgeable counsel at the time of the trial. (Perez , at *6-7.) To be clear, we do not mean to suggest that counsel should make frivolous objections contrary to settled law in the unjustified hope the argument might stick on appeal. Rather, competent and knowledgeable counsel need only make timely and specific objections when there are reasonably foreseeable changes in the law on the horizon based on the existing decisional law at the time, such as here. *196 Defendant's contentions premised on the specific confrontation clause claims he makes on appeal have been forfeited.
D. Ineffective Assistance of Counsel Claim Related to the Failure to Object on Specific Confrontation Clause Grounds
Defendant contends that counsel was ineffective for failing to adequately object on confrontation clause grounds to the prior crimes and police contact evidence about which the prosecution's gang expert testified as part of the basis of his opinion concerning defendant's Meadowview Bloods gang membership. Defendant also argues on appeal that the admission of the expert's testimony about the predicate felonies offered to prove that the Meadowview Bloods are a criminal street gang and defendant's phone conversations from the jail violated his confrontation clause rights, but does not specifically argue that trial counsel's failure to object to those parts of the expert's testimony amount to ineffective assistance of counsel. We shall, nevertheless, address those contentions to forestall future claims of ineffective assistance of trial and appellate counsel.
1. Ineffective Assistance of Counsel Principles
To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. ( Strickland, supra , 466 U.S. at pp. 688, 691-692, 104 S.Ct. 2052 ; People v. Ledesma (1987) 43 Cal.3d 171, 216-217, 233 Cal.Rptr. 404, 729 P.2d 839 ( Ledesma ); People v. Rogers (2016) 245 Cal.App.4th 1353, 1367, 200 Cal.Rptr.3d 355 ( Rogers ).) " 'Surmounting Strickland 's high bar is never an easy task.' " ( Harrington v. Richter (2011) 562 U.S. 86, 105, 131 S.Ct. 770, [178 L.Ed.2d 624, 642] ( Richter ), quoting Padilla v. Kentucky (2010) 559 U.S. 356, 371, 130 S.Ct. 1473, [176 L.Ed.2d 284, 297].) The reason why Strickland 's bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of *942 the very adversary process the right to counsel is meant to serve. [Citation.] ... It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " ( Richter , at p. 105, 131 S.Ct. 770.)
To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " ( Richter, supra , 562 U.S. at p. 104, 131 S.Ct. 770.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. ( Strickland, supra , 466 U.S. at pp. 693-694, 104 S.Ct. 2052 ; Ledesma, supra , 43 Cal.3d at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ( Strickland , at p. 694, 104 S.Ct. 2052 ; accord, Ledesma , at p. 218, 233 Cal.Rptr. 404, 729 P.2d 839.) "The likelihood of a different result must be substantial , not just conceivable." ( Richter , at p. 112, 131 S.Ct. 770, italics added; Rogers, supra , 245 Cal.App.4th at p. 1367, 200 Cal.Rptr.3d 355 ; People v. Jacobs (2013) 220 Cal.App.4th 67, 75, 162 Cal.Rptr.3d 739 ; In re M.P. (2013) 217 Cal.App.4th 441, 457, fn. 10, 158 Cal.Rptr.3d 458.) Strickland 's prejudice standard applies even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional *197 rights. ( People v. Mesa (2006) 144 Cal.App.4th 1000, 1008-1009, 50 Cal.Rptr.3d 875 ( Mesa ) [noting that had defendant not forfeited his constitutional claim, the appellate court would have reviewed whether any such error was harmless under the standard set forth in Chapman but instead must review the matter under the standard in Strickland for ineffective assistance of counsel].)
2. The Gang Expert's Testimony
We now turn to the expert's testimony to consider what portions of this testimony should not have been relayed to the jury, because the failure to object to that evidence bears on the first prong of the ineffective assistance of counsel test-whether trial counsel's performance was deficient. We first look at his testimony regarding the prior crimes and contacts defendant had with law enforcement used as part of the basis for the expert's opinion that defendant was a member of the Meadowview Bloods.
The prosecution's gang expert testified about the following events, which served as part of the basis for his opinion concerning defendant's gang membership: the November 1991 incident when defendant was shot in the back allegedly in relation to a rivalry between the Oak Park Bloods and the Meadowview Bloods; the December 1992 incident where defendant was arrested for a felony warrant and admitted possession of rock cocaine found at the location; the June 1993 incident when he was in a car with others where a firearm was found; an incident in October 1993 when, while running from the police, he displayed a firearm and was shot by the officer; the January 1995 police contact involving a domestic violence call; his commission of armed robbery in September 1995; and his commission of unspecified gang crimes in April 2002 with a Del Paso Heights Blood. These events each had gang overtones *943 related to the people with whom defendant was associated at the time, the nature of the crime being consistent with the primary activities of the Meadowview Bloods, defendant's identification as a Meadowview Blood at the time, the color of the clothes defendant was wearing, or the discovery of gang writing and defendant's tattoo. The People concede that this testimony was hearsay, testimonial, and case-specific under Sanchez .[19]
In addition to the hearsay upon which the expert relied in opining about defendant's gang membership, defendant also now objects on Crawford / Sanchez grounds to the expert's testimony concerning the predicate offense testimony offered to establish that the Meadowview Bloods is a criminal street gang. To establish that an organization is a criminal street gang, the prosecution must prove, among other things, that the group has engaged in a pattern of criminal conduct, and this requires a showing that the group has engaged in the requisite number of enumerated predicate offenses. (§ 186.22, *198 subd. (e).) On this issue, we note that case-specific facts must be distinguished from matters that are within a gang expert's general knowledge based on training, education, and experience and about which the expert may testify notwithstanding the fact that such matters are, technically, hearsay. ( Sanchez, supra , 63 Cal.4th at pp. 676, 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
Sanchez did "not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his [or her] expertise." ( Sanchez, supra , 63 Cal.4th at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.) As the Sanchez court observed, "an expert's background knowledge and experience is what distinguishes him [or her] from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth." ( Ibid . ) A gang expert may relate such background information regarding his or her knowledge and expertise, as well as premises generally accepted within his or her field, even though such testimony is offered for its truth. ( Ibid . ) Thus, a gang expert may testify concerning general background information relating to gang culture and the "history and general operations" of a specific gang. ( Id . at p. 698, 204 Cal.Rptr.3d 102, 374 P.3d 320, italics added.) Applying this rule to the facts in Sanchez , our high court noted that *944 the gang expert's testimony about "general gang behavior or descriptions of the ... gang's conduct and its territory" was "background testimony." ( Id . at p. 698, 204 Cal.Rptr.3d 102, 374 P.3d 320, italics added.) Such testimony is based on well-recognized sources in the expert's area of expertise. ( Ibid . ) As the court recognized in Meraz , Sanchez 's reference to general background testimony "plainly includes the general background testimony [the gang expert gives] about [the gang's] operations, primary activities , and pattern of criminal activities , which was unrelated to defendants or the current" crimes. ( Meraz, supra , 6 Cal.App.5th at p. 1175, 212 Cal.Rptr.3d 81, review granted, italics added; accord, People v. Vega-Robles (2017) 9 Cal.App.5th 382, 411, 224 Cal.Rptr.3d 19 ( Vega-Robles ).) Thus, a gang expert is properly "permitted to testify to non-case-specific general background information about [the gang], its rivalry with [another gang], its primary activities , and its pattern of criminal activity , even if it was based on hearsay sources." ( Meraz , at p. 1175, 212 Cal.Rptr.3d 81, italics added.)
Defendant, asserted in his original briefing that admission of the gang expert's testimony relaying the facts of the predicate offenses required to prove the gang enhancement violated his confrontation clause rights. The expert's testimony on the predicate offenses here included the gang membership of the people involved in those prior offenses. In his supplemental reply brief, defendant asserts that the facts necessary to prove a pattern of criminal gang activity pursuant to section 186.22 are case-specific facts within the meaning of Sanchez because they are facts used to prove the gang enhancement which is charged in the particular case. Citing Sanchez, supra , 63 Cal.4th at page 676, 204 Cal.Rptr.3d 102, 374 P.3d 320, defendant claims "[w]hen, as here, the prosecution has charged a gang enhancement, testimonial hearsay concerning the incidents and participants offered to prove the charged gang enhancement 'relat[e] to the particular events and participants alleged to have been involved in the case being tried.' " We disagree.
Sanchez did not address facts underlying predicate offenses; rather, the court's focus was on facts used by the gang *199 expert to establish the defendant's gang membership. ( Sanchez, supra , 63 Cal.4th at p. 670, 204 Cal.Rptr.3d 102, 374 P.3d 320 ["We hold that the case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law" (italics added) ].) As we have noted, our high court defines case-specific facts to be facts "relating to the particular events and participants alleged to have been involved in the case being tried." ( Id . at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320.) The predicate offenses used in this case do not fall within this definition; they did not involve the particular events or participants involved in the case being tried.[20] Rather, they are historical facts related to the gang's conduct and activities. These facts pertain to the gang as an organization and are not *945 specific to the case being tried. They establish that the "organization, association, or group" has engaged in a "pattern of criminal gang activity" and is thus a criminal street gang (§ 186.22, subd. (f) ) irrespective of the events and participants in the case being tried . A predicate offense and the underlying events are essentially a chapter in the gang's biography. Thus, they are relevant to a gang expert's opinion about whether a group has engaged in a pattern of criminal gang activity and is a criminal street gang under the statutory definition. Moreover, predicate offenses are specific examples of the gang's primary activities and thus such evidence is relevant to the gang expert's opinion about the primary activities of the gang. Consequently, the facts related to the predicate offenses here are more appropriately characterized as background information relevant and admissible to the past "conduct" of the Meadowview Bloods and the gang's "history and general operations." ( Sanchez , at p. 698, 204 Cal.Rptr.3d 102, 374 P.3d 320.) We agree with the courts in Vega-Robles and Meraz that a gang's " 'operations, primary activities, and pattern of criminal activities ' " are background facts, not case-specific facts, under Sanchez and a gang expert is permitted to testify about such things, even if that testimony is based on hearsay sources. ( Vega-Robles, supra , 9 Cal.App.5th at p. 411, 224 Cal.Rptr.3d 19, italics added, quoting Meraz, supra , 6 Cal.App.5th at p. 1175, 212 Cal.Rptr.3d 81.) The expert's testimony about the predicate offenses here did not violate the rules in Sanchez .[21] *200 *946 3. Deficient Performance
Having outlined the applicable confrontation clause principles and the body of evidence to which defendant now objects on Crawford / Sanchez grounds, we now address whether defendant has met his burden of showing trial counsel's performance was deficient, the first prong of the Strickland test for ineffective assistance of counsel. ( Strickland, supra , 466 U.S. at pp. 688, 691-692, 104 S.Ct. 2052 ; Ledesma, supra , 43 Cal.3d at p. 216, 233 Cal.Rptr. 404, 729 P.2d 839.) The deficient performance prong of the ineffective assistance of counsel test " 'is necessarily linked to the practice and expectations of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." ' [Citations.] 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' " ( Hinton v. Alabama (2014) 571 U.S. 263, 134 S.Ct. 1081, [188 L.Ed.2d 1, 8-9].)
Prevailing professional standards dictate that competent counsel are required to know the state of the law applicable to issues in their cases. (See Harris v. Thompson (7th Cir. 2012) 698 F.3d 609, 644 [a " 'reasonably competent attorney patently is required to know the state of the applicable law' "].) And as this court long ago observed, counsel is expected to " 'discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques.' " ( People v. McCary (1985) 166 Cal.App.3d 1, 8, 212 Cal.Rptr. 114.) While trial counsel cannot be faulted "when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change" ( People v. Turner (1990) 50 Cal.3d 668, 703, 268 Cal.Rptr. 706, 789 P.2d 887 ), well before defendant's trial, much of Sanchez was reasonably foreseeable.
We conclude that counsel's performance in failing to object to the introduction of defendant's prior crimes and contacts with law enforcement on the specific confrontation clause grounds defendant asserts on appeal fell below an objective standard of reasonableness under prevailing professional norms. ( Strickland, supra , 466 U.S. at p. 688, 104 S.Ct. 2052 ; Ledesma, supra , 43 Cal.3d at p. 216, 233 Cal.Rptr. 404, 729 P.2d 839.) Trial counsel did not cite Crawford , Williams , Dungo , or Mercado in writing prior to the in limine hearing or orally during the in limine hearing. Indeed, counsel never even mentioned Crawford , one of the most important confrontation clause cases ever decided by the United States Supreme Court. At no time did counsel argue that the gang expert's basis testimony was testimonial hearsay and therefore violated the confrontation clause. As we *947 have said, given Crawford , Williams and Dungo , it was reasonably foreseeable that our high court would reject Gardeley and the confrontation *201 clause reasoning in cases like Thomas . The rejection of the not-for-the-truth theory by justices in Williams and Dungo and the Dungo court's adoption of the primary purpose and formality/solemnity criteria for determining whether statements are testimonial signaled that the reasoning in Thomas immunizing such expert testimony from confrontation clause challenges was no longer viable. All of this was presaged by the court in Hill long before defendant's trial and reinforced by the opinion in Mercado , two days before the hearing on defendant's in limine motion and nine days before the expert here testified.
The prior crime and police contact testimony relevant specifically to defendant here, which our high court now characterizes as case-specific testimonial hearsay, supported the prosecution's position that defendant was an active member of the Meadowview Bloods, that, when he shot Sisoukchaleun, he did so for the benefit of that particular criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members within the meaning of section 186.22. In our view, given the evolution of the decisional law prior to defendant's trial and the foreseeable analytical path our high court would take on gang expert opinion basis testimony when presented with that issue post- Dungo , there was no satisfactory explanation for trial counsel's failure to object to the introduction of this evidence. Indeed, even if the trial court had overruled the objection, in the environment where the analytical rules concerning confrontation clause violations were so obviously and quickly evolving, the objection would have served the useful purpose of preserving the contention for appeal, as the defendant in Sanchez apparently did, thus requiring application of the Chapman harmless beyond a reasonable doubt standard,[22] a much more difficult standard for the People to overcome than the prejudice analysis required under the Strickland reasonable probability test. ( Mesa, supra , 144 Cal.App.4th at pp. 1008-1009, 50 Cal.Rptr.3d 875.) Thus, under prevailing professional norms it was unreasonable for trial counsel to fail to make the confrontation clause objection defendant now makes on appeal concerning his prior law enforcement contacts and to fail to cite the then-existing case law supporting the changes in confrontation clause analysis.
However, the expert's testimony concerning the underlying facts of the predicate offenses did not violate defendant's confrontation clause rights. As we have said, this evidence was general background information about the gang's history and prior conduct. (See Sanchez, supra , 63 Cal.4th at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
*948 It is information upon which experts in the field can rely in opining whether the organization in question is a criminal street gang within the meaning of section 186.22. Moreover, such information is not considered testimonial for confrontation clause purposes. (See People v. Valadez (2013) 220 Cal.App.4th 16, 32-36, 162 Cal.Rptr.3d 722 [general background information obtained from gang members, other officers, and written materials on the history of the gang used by experts in the field is not testimonial].) Forgoing an objection to this evidence was not deficient performance.
4. Prejudice *202 We turn to the question of whether what we have concluded to be deficient performance by trial counsel prejudiced defendant. ( Strickland, supra , 466 U.S. at pp. 691-692, 104 S.Ct. 2052.) To demonstrate prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. ( Id . at pp. 693-694, 104 S.Ct. 2052 ; Ledesma, supra , 43 Cal.3d at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) Our review requires that we address prejudice as to each count and enhancement.
a. Ineffective Assistance Prejudice-First Degree Murder ( §§ 187, 189 )
Given the admissible evidence heard by the jury, we conclude that defendant has not suffered Strickland prejudice. There is no reasonable probability defendant would have received a more favorable result on the murder charge had the gang expert been precluded from providing testimonial hearsay basis testimony about his prior contacts with the police.
*949 At trial, defendant did not dispute that he shot Sisoukchaleun twice, once in the face and once in the side, and that Sisoukchaleun died as a result. Defendant's theory at trial was that he had acted in self-defense or imperfect self-defense. But the evidence showed defendant did not act in either complete self-defense or imperfect self-defense, and there was compelling evidence of planning, motive, and manner of killing. Courts look to evidence of planning, motive, and manner of killing as guidelines to assess the sufficiency of evidence establishing deliberation and premeditation (see generally People v. Sandoval (2015) 62 Cal.4th 394, 424, 196 Cal.Rptr.3d 424, 363 P.3d 41 ; People v. Anderson (1968) 70 Cal.2d 15, 26-27, 73 Cal.Rptr. 550, 447 P.2d 942 ), and we find it useful to apply those guidelines here in our review of prejudice as to the murder charge.
The jury heard evidence from Vue, Thammavongsa, and Manivong concerning the circumstances leading up to the altercation, culminating in defendant shooting Sisoukchaleun. Their testimony was augmented by the surveillance video.
With regard to planning, the trial evidence demonstrated that defendant walked out from the recessed entry where had been standing to the sidewalk in front of the entry as Sisoukchaleun and Thammavongsa approached from one direction and Manivong and Ketphanh approached from the opposite direction. There on the sidewalk, defendant exchanged words with the group. When the truck pulled up, defendant turned and left the entryway, unimpeded, leaving Sisoukchaleun's group in the entryway.
*203 Defendant then went to his pickup truck and retrieved a gun. Instead of getting in his truck and leaving the scene, defendant chose to re-engage Sisoukchaleun's group. The video shows that at this point, Sisoukchaleun's group was still in the recessed entryway of the liquor store while defendant was on the sidewalk some distance away. Defendant's demeanor is animated and he appears to be angry. The video shows Sisoukchaleun taking off his shirt. He then walked toward defendant, momentarily confronted him, and then walked into the street. Vue testified that, while the conversation had not been aggressive at its inception, as it proceeded, the African-American man "got into Bud's face." After Sisoukchaleun walked into the street, an unidentified African-American man approached defendant with his arm extended, placed his arm over defendant's chest, and appeared to speak to defendant in an effort to get defendant to disengage. Defendant then walked toward the street, away from the cab of the truck, and out of the camera frame. Evidence showing defendant retrieving the gun, reengaging Sisoukchaleun, refusing to disengage, and walking into the street toward Sisoukchaleun just prior to the shooting was indicative of planning.
As for motive, the jury properly had before it witness testimony that defendant invoked the name of the Meadowview Bloods criminal street gang after Sisoukchaleun and Manivong walked up making hand gestures and Thammavongsa and Sisoukchaleun uttered the term "cuz." After defendant invoked the name of Meadowview Bloods, Sisoukchaleun invoked the name of the LGC or Lao Gangster Crip, with which both Thammavongsa and Sisoukchaleun were affiliated. Thammavongsa acknowledged that such an *950 exchange amounted to "fighting words" because Bloods and Crips do not get along. Based on a hypothetical set of facts, the gang expert properly testified that the exchange would constitute a "drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods." The expert also testified: "At that point, the individual-once he puts out, 'I'm a Blood,' you know ... this is not gonna go anywhere good."
Additionally, the expert testified that he personally observed defendant's "Meadowview" tattoo at trial. This was further evidence of defendant's gang affiliation, and this evidence was admissible under Sanchez . ( Sanchez, supra , 63 Cal.4th at p. 677, 204 Cal.Rptr.3d 102, 374 P.3d 320 [a defendant's tattoo is a case-specific fact that may be established by a witness who saw the tattoo and the fact that the tattoo's design is a symbol that has been adopted by a criminal street gang is background information about which a gang expert may testify].)
The jury also heard defendant's jail phone conversations. In one conversation, he and the person with whom he spoke referred to each other as "blood" several times. As the gang expert explained, Blood gang members commonly refer to one another by the word, "blood." In another conversation, defendant talked about having previously been shot by a Crip " 'because it was sort of a gang shooting' " and that he was housed near a Crip in the jail, but he did not care " '[l]ong as that nigga don't say nothing crazy.' " What can be inferred from this evidence is that, unlike the Crip with whom defendant was housed in the jail, Sisoukchaleun had said something crazy to defendant by disrespecting defendant and his criminal street gang. The motive here was quite obviously gang related, even without the case-specific testimonial hearsay in the gang expert's testimony.
As for manner of killing, after defendant retrieved his firearm from the truck and re-engaged Sisoukchaleun, he followed Sisoukchaleun *204 into the street where Sisoukchaleun apparently thought they would engage in a fist fight. Instead, defendant shot Sisoukchaleun twice after Sisoukchaleun threw one wild punch. The first shot was aimed at Sisoukchaleun's face, right between the eyes, and was fired at almost point-blank range. Defendant fired a second shot into the side of his Sisoukchaleun's torso, also from close range. The parts of the body defendant targeted showed a cold, calculated, and deliberate effort to end Sisoukchaleun's life.
In addition to the very strong evidence of planning, motive, and manner of killing, there was also evidence evincing defendant's consciousness of guilt. When he was arrested later in the day, the pants with the distinctive red design he had worn earlier during the shooting were in a bag. Also found in the car in which defendant was riding were the license plates from his truck. After he finished urinating at a police facility restroom, he was told not to *951 wash his hands. Defendant looked at the detective and washed them anyway. As a consequence, a gunshot residue test could not be done. When interviewed by the police, defendant claimed someone had stolen his truck. He repeated that lie to others. He said that was his story and he was "sticking with it."
Defendant contends that the jury rejected self-defense and imperfect self-defense because of the testimony concerning his prior law enforcement contacts. The trial court instructed the jury with CALCRIM No. 505 on complete self-defense and imperfect self-defense. Instead of leaving after the initial confrontation,[23] defendant retrieved the gun from his pickup. There was no evidence that Sisoukchaleun or anyone in his group had any weapons or threatened to use weapons. Nor was there any evidence of a threat to inflict great bodily injury upon defendant or to use any type of lethal force.[24] The only force defendant faced is evidenced by Sisoukchaleun's challenge, " 'Let's fight' " and his preparation to do so by taking off his shirt. As we have noted, the video shows an unidentified person tried to get defendant to disengage just moments before defendant took Sisoukchaleun's life. During his interview with the police and the numerous phone conversations defendant had with people from the jail, he never made any claim of self-defense or indicated in any way that he felt threatened. Defendant's lies, concealment, and destruction of evidence evinced not only his general consciousness of guilt, but more particularly, that he knew he had not acted in self-defense. Given the evidence, we conclude that a reasonable jury would have rejected defendant's self-defense and imperfect self-defense arguments even if it had not heard the testimony concerning defendant's prior law enforcement contacts.
Based on the totality of the evidence, we conclude that, had the gang expert's objectionable case-specific testimonial hearsay testimony not been allowed, the jury would have still found defendant guilty of first degree murder. There is no reasonable probability that defendant would have achieved a more favorable result on the *205 murder charge had defense counsel objected at trial, preventing the gang expert from testifying about defendant's prior crimes and contacts with law enforcement. ( Strickland, supra , 466 U.S. at pp. 693-694, 104 S.Ct. 2052 ; Ledesma, supra , 43 Cal.3d at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) *952 b. Ineffective Assistance Prejudice-Possession of a Firearm by a Felon (§ 29800, subd. (a)(1) )
The parties stipulated that defendant previously had been convicted of a felony. There is no dispute that defendant possessed a firearm. The video shows defendant going to the pickup truck to retrieve it. Witnesses testified that, in the midst of the altercation with Sisoukchaleun in the street, defendant pulled out a gun. Manivong heard a woman say, " 'He's got a gun.' " Defendant then shot Sisoukchaleun twice.
This evidence established a violation of section 29800, subdivision (a)(1). There is no reasonable probability that the jury would have found defendant not guilty on count two, possession of a firearm by a felon, if the objectionable testimonial hearsay evidence from the gang expert had been precluded.
c. Ineffective Assistance Prejudice-Firearm Enhancements (§§ 12022.53, subds. (b), (d), 12022.5, subd. (a) )
In the commission of murder, defendant personally and intentionally discharged a firearm causing Sisoukchaleun's death. Again, defendant did not dispute shooting Sisoukchaleun. He only maintained that he did so in self-defense or imperfect self-defense. Subdivision (l ) of section 12022.53 provides that "[t]he enhancements specified in this section shall not apply to the lawful use or discharge of a firearm ... by any person in lawful self-defense, lawful defense of another, or lawful defense of property, as provided in Sections 197, 198, and 198.5." However, as can be readily seen, the jury appropriately rejected defendant's claims of self-defense and imperfect self-defense and would have done so without the inadmissible basis testimony given the evidence we recounted in our discussion of defendant's ineffective assistance of counsel claim related to his first degree murder conviction.
We conclude there is no reasonable probability that, but for of the objectionable gang expert testimony, the jury would have found the firearm allegations not true.
d. Ineffective Assistance Prejudice-Criminal Street Gang Enhancement (§ 186.22, subd. (b)(1) )
To prove the section 186.22, subdivision (b)(1), enhancement, the People were required to prove that the defendant committed the murder for the benefit of a criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members. (§ 186.22, subd. (b)(1); CALCRIM No. 1401 ;
*953 Gardeley, supra , 14 Cal.4th at pp. 616-617, 59 Cal.Rptr.2d 356, 927 P.2d 713.) Before discussing whether defendant was prejudiced under Strickland as to the gang enhancement, it is important to note that the case-specific testimonial hearsay concerning defendant's prior crimes and law enforcement contacts was introduced to show that defendant was a Meadowview Bloods gang member. Yet, the prosecution need not prove that a defendant is an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1). ( Sanchez, supra , 63 Cal.4th at p. 698, 204 Cal.Rptr.3d 102, 374 P.3d 320 ; People v. Bragg (2008) 161 Cal.App.4th 1385, 1402, 75 Cal.Rptr.3d 200 ;
*206 In re Ramon T. (1997) 57 Cal.App.4th 201, 207, 66 Cal.Rptr.2d 816.) Evidence of gang membership helps establish a defendant's intent to assist, further, or promote criminal conduct by gang members, but it is not an element of the enhancement. ( Sanchez , at pp. 698-699, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
In considering whether defendant suffered Strickland prejudice as to the gang enhancement, we shall exclude the testimonial hearsay, specifically the gang expert's case-specific testimony concerning defendant's prior crimes and contacts with law enforcement as indicators of defendant's involvement in the Meadowview Bloods criminal street gang. After excluding that evidence from the calculus, we consider what evidence is left to prove the section 186.22, subdivision (b)(1), enhancement.
As we have noted, Sisoukchaleun and Manivong both made hand gestures as they walked up to Sunland, and they can be seen doing so on the surveillance video. Thammavongsa and Sisoukchaleun both uttered the term " 'cuz.' " According to Thammavongsa, after he said, " 'Cuz, get some drink,' " defendant said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' " According to Vue, the man who was involved in the confrontation with Sisoukchaleun said, " 'I am a Blood.' " Vue also testified that, after Thammavongsa said something about wanting to race, the man fitting defendant's description and whom she identified in a photographic lineup stated: " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' " According to Thammavongsa, Sisoukchaleun " 'got tired of hearing' " defendant say " 'Blood, Meadowview' " Sisoukchaleun invoked the name LGC or Lao Gangster Crip, with which both Thammavongsa and Sisoukchaleun were affiliated. Thammavongsa acknowledged that such an exchange would amount to "[f]ighting words" because Bloods and Crips do not get along. The gang expert testified that, in a hypothetical situation mirroring the facts of this case, the shooter's actions would benefit the Bloods. He indicated that by invoking the name of the Blood gang after Sisoukchaleun's group invoked the name of the Crips, defendant "put[ ] everyone on notice" that what they were doing was "disrespectful to [him] being a Blood gang member. ... [¶] There's two ways that it can go right there. The Crip can, 'Hey, man, sorry. You know, it all cool. Let's just hang out' or take offense to the challenge of him not respecting and *954 challenging him by saying 'It's Blood' thing. And it's that drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods."
There was additional evidence establishing defendant's gang membership. The use of the word "blood" during the recorded phone conversations and defendant's acknowledgment that he had been previously shot by a Crip in a gang-related shooting tended to establish that defendant was a Meadowview Blood. Additionally, defendant's Meadowview tattoo further proves his gang membership, another fact the gang expert considered in forming his opinion. Lastly, the gang expert opined that defendant was a Meadowview gang member based on the facts of the case.
Based on the foregoing, we conclude that there is no reasonable probability that defendant would have achieved a not true finding on the gang enhancement had counsel made the confrontation clause objection he asserts on appeal and successfully achieved the preclusion of the gang expert's testimony concerning defendant's prior crimes and contacts with law enforcement.
*207 [25] ( Strickland, supra , 466 U.S. at pp. 693-694, 104 S.Ct. 2052 ; Ledesma, supra , 43 Cal.3d at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) While the expert's basis testimony concerning defendant's prior crimes and police contacts may have bolstered the conclusion that defendant was a Meadowview Bloods gang member who murdered Sisoukchaleun for the benefit of his gang, and that, in doing so, he had the specific intent to further or promote criminal conduct by his fellow gang members, we conclude that there is no reasonable probability that excluding that evidence would have resulted in a more favorable outcome for defendant on the gang enhancement. As we have noted, while the likelihood of a different outcome may be conceivable , that likelihood must be substantial to establish Strickland prejudice. ( Richter, supra , 562 U.S. at p. 112, 131 S.Ct. 770.) In our view, the likelihood of a more favorable outcome on the gang enhancement here was neither conceivable nor substantial.
5. Ineffective Assistance Claim-Conclusion
We conclude that trial counsel's failure to register specific objections to the gang expert's case-specific testimonial hearsay testimony on Crawford / Sanchez grounds resulted in no prejudice to defendant as to any of the charges or enhancement allegations.[26] Therefore, we reject his contention *955 that his convictions must be reversed due to constitutionally ineffective assistance of trial counsel on this ground.[27]
E. Chapman
As we have noted, when an evidentiary error is forfeited and a claim of ineffective assistance of counsel has been made, we must review the error under the less burdensome Strickland standard for prejudice instead of the stricter Chapman harmless error standard related to evidentiary error based on constitutional claims. The dissent rejects forfeiture and concludes that the error requires reversal of the murder conviction and the firearm and gang enhancement findings based on Chapman, supra , 386 U.S. 18, 24, 87 S.Ct. 824.
Even if we were to conclude that defendant did not forfeit his confrontation clause contentions, we would conclude that the error in admitting the gang expert's testimony discussed at length *208 here was harmless under Chapman as to all of defendant's convictions and enhancement findings. (See generally Chapman, supra , 386 U.S. at pp. 23-24, 87 S.Ct. 824.) Since Chapman , our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " ( People v. Geier (2007) 41 Cal.4th 555, 608, 61 Cal.Rptr.3d 580, 161 P.3d 104 ( Geier ).) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " ( Ibid . ; People v. Livingston (2012) 53 Cal.4th 1145, 1159, 140 Cal.Rptr.3d 139, 274 P.3d 1132.) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." ( People v. Reese (2017) 2 Cal.5th 660, 671, 214 Cal.Rptr.3d 706, 390 P.3d 364, italics added, citing People v. Aranda (2012) 55 Cal.4th 342, 367, 145 Cal.Rptr.3d 855, 283 P.3d 632.)
For the same reasons we discussed in our Strickland prejudice analysis regarding the murder conviction and gang and firearm enhancements, we *956 conclude beyond a reasonable doubt that the constitutional error here did not contribute to the verdict. Given the eyewitness testimony, video surveillance recording, and defendant's post-offense statements and conduct, it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty of this cold blooded deliberate and premeditated murder and of being a felon in possession of a firearm, and found the enhancement allegations true absent the error. ( People v. Livingston (2012) 53 Cal.4th 1145, 1159, 140 Cal.Rptr.3d 139, 274 P.3d 1132 ; Geier, supra , 41 Cal.4th at p. 608, 61 Cal.Rptr.3d 580, 161 P.3d 104.)
The dissent maintains that an alternative "interpretation" of the video exists that suggests Sisoukchaleun was the aggressor and that the defendant acted in self-defense. According to this interpretation, it is "possible that [defendant] simply returned to pick up his alcohol and Sisoukchaleun and his friends re-engaged defendant" (Dis. opn., post , at p. 219) as opposed to our view that defendant re-engaged the group after retrieving his gun from his truck. Without going back over the detail of the video again, suffice it to say that we simply disagree with the dissent's view of the sequence of events reflected therein. Moreover, in arriving at the interpretation where Sisoukchaleun was the aggressor, the dissent overlooks the fact that an unidentified individual walked out from the recessed entryway to where defendant was standing on the sidewalk and put his arm out to stop defendant from following Sisoukchaleun into the street. Defendant pointed his finger at that person's chest, appeared to argue with him, then stepped around him, and went into the street where the other evidence shows defendant ultimately aimed his gun between Sisoukchaleun's eyes and pulled the trigger. Also, in rejecting our Chapman conclusion, the dissent fails to address the statements defendant made to others where he never claimed self-defense or that he was in fear, and further fails to address the evidence of defendant's consciousness of guilt.
The error here did not contribute to the first degree murder verdict or the enhancement findings and thus the People have satisfied their burden of establishing that the error was harmless beyond a reasonable doubt.
*209 II.-XI.[28]
DISPOSITION
We remand this matter to the trial court with directions to: (1) strike the 10-year sentence imposed pursuant to section 186.22, subdivision (b)(1)(C);
*957 (2) consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements; and, in the event that the court declines to exercise its discretion to strike the firearm enhancements; (3) impose sentences on the section 12022.5, subdivision (a), and 12022.53, subdivision (b), enhancements and then stay execution of those sentences pursuant to section 12022.53, subdivision (f). The trial court is directed thereafter to prepare an amended abstract of judgment reflecting these modifications and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.
The judgment is otherwise affirmed.
I concur:
NICHOLSON J.[38]

Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

Manivong testified that he was not a gang member, and he did not "represent nothing."

At trial, Vue did not identify the African-American male she observed on the night of the shooting. However, according to a former Sacramento Police Department sergeant, on February 15 or 16, 2012, Vue identified defendant in a photo lineup as the shooter.

Only Vue used the term " 'Little Asian Crip.' " Thammavongsa testified that both he and Sisoukchaleun were "affiliated" with LGC, or Lao Gangster Crips. Neither Thammavongsa nor Manivong said they recalled hearing anyone say "LGC" or "Little Gangster Crip." However, Thammavongsa testified that a possible response if defendant said, " 'Meadowview Blood' " would be to say, " 'No, this is LGC.' "

When viewing the surveillance video during her testimony, Vue initially pointed to a different unidentified African-American individual as being the person who spoke with Sisoukchaleun and who subsequently walked over to the white pickup truck. Defendant's trial counsel argued in closing that it was not clear defendant was the individual who spoke with Sisoukchaleun. Nonetheless, ultimately, at trial and on appeal, defendant does not dispute he was the individual who interacted with, and ultimately shot and killed, Sisoukchaleun.

Although not raised by the parties, we address the trial court's failure to impose a sentence on each of these enhancements and then stay execution thereof in part X. of the Discussion, post .

The record does not reflect what crimes, if any, the gang expert testified about that were not "specifically noticed by the prosecution."

In the gang-specific in limine motions, trial counsel asked the court to "place reasonable and appropriate limits on the gang expert's testimony." Under the heading "Issues to be Addressed," counsel contended the following aspects of Saario's anticipated testimony should not be admitted: (1) Saario's opinion that defendant had the intent to promote or assist the gang; (2) that defendant actively participates in the Meadowview Bloods because such would be "unfounded speculation"; (3) the primary activities of the Meadowview Bloods, purportedly because Saario had insufficient knowledge upon which to base an opinion; (4) "hearsay statements about [d]efendant's association with the Meadowview Bloods because he explicitly states that his opinion is not based in any way on such information" (boldface omitted); (5) an incident that took place on January 11, 2012, when defendant was visiting a residence where a search warrant was served and he resisted handcuffing, resulting in a struggle where the officers choked defendant.

The other arguments counsel made in the gang-specific in limine motions were: the trial court is the "gatekeeper regarding the admissibility of expert opinion," (uppercase omitted) citing cases pertaining to the Federal Rules of Evidence, including Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993) 509 U.S. 579, 113 S.Ct. 2786, [125 L.Ed.2d 469] and Kumho Tire Co., Ltd. v. Carmichael (1999) 526 U.S. 137, 119 S.Ct. 1167, [143 L.Ed.2d 238] ; the gang expert's opinion that the behavior of gang members is predictable and subject to a set of rules is inadmissible unless a "Kelly - Frye " foundation is established (see People v. Kelly (1976) 17 Cal.3d 24, 30, 130 Cal.Rptr. 144, 549 P.2d 1240 ; Frye v. United States (D.C. Cir. 1923) 293 F. 1013, 1014 ); the gang expert's opinion was based on "inadmissible profile evidence" (uppercase omitted) and the court should limit the expert's testimony "so that profile evidence is not proffered to the jury"; "the gang expert's testimony that saying Meadowview Bloods make you a member of that gang is not the proper subject of expert opinion under [Evidence Code] section 801" (uppercase omitted); and "whether defendant 'actively participates' in a criminal street gang is not the proper subject of expert opinion" (uppercase omitted).

In later arguing, "whether defendant 'actively participates' in a criminal street gang is not the proper subject of expert opinion," (uppercase omitted) counsel cited some of the same decisional law pertaining to section 186.22, subdivision (a).

Defendant does not contend on appeal that the trial court abused its discretion in admitting the gang expert's testimony concerning any or all of the events over his written Evidence Code sections 1101 and 352 objections, but he does assert that counsel's failure to register specific and timely objections on those statutory grounds amounted to constitutional ineffective assistance of counsel. We reject that contention for failure to show prejudice in the unpublished portion of this opinion, post .

Defendant does not challenge the trial court's ruling on the oral bifurcation motion in this appeal.

Trial counsel clarified an apparent agreement between her and the prosecutor that the gang expert would not mention defendant's 2002 conviction for pimping and pandering. Rather, the expert would simply say that "on 4/22/02, [defendant] was committing a gang-related crime with Lawrence Barnett, who is a Del Paso Heights Blood."

In pertinent part, Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Italics added.)

We acknowledge, as did the Perez court, that "Williams , Dungo , and Mercado did not anticipate the distinction that Sanchez ultimately drew between case-specific and non-case-specific hearsay." (Perez, supra , 22 Cal.App.5th 201, 22 Cal.App.5th 201, 2018 WL 1755590 [2018 Cal.App. Lexis at *16].) Rather, those cases "suggested that any hearsay that is offered as the basis for an expert's opinion testimony is necessarily offered for its truth." (Ibid . )

The four-justice plurality concluded that the report was nontestimonial because the report was not made for the primary purpose of targeting a specific individual or to create evidence for use at trial. (Williams, supra , 567 U.S. at p. 84, 132 S.Ct. 2221.) Justice Thomas, who concurred, agreed that the report was nontestimonial, but for the reason that the report lacked indicia of solemnity. (Id . at p. 111, 132 S.Ct. 2221 (conc. opn. of Thomas, J.).)

While the Gardeley court allowed hearsay as basis testimony, it cautioned that admission of otherwise inadmissible hearsay is not automatic. "A trial court ... 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness ... against the risk that the jury might improperly consider it as independent proof of the facts recited therein .' [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (Gardeley, supra , 14 Cal.4th at p. 619, 59 Cal.Rptr.2d 356, 927 P.2d 713, italics added.) In addition to not specifically objecting on the grounds defendant now asserts on appeal, trial counsel did not ask the trial court to engage the weighing process suggested in Gardeley .

The court concluded it need not resolve the question of the defendant's forfeiture because the People had forfeited the forfeiture argument by failing to raise it in the Court of Appeal. (Gallardo , supra , 4 Cal.5th at p. 128, 226 Cal.Rptr.3d 379, 407 P.3d 55.) Thus, the Gallardo court never expressly stated whether Descamps made rejection of McGee foreseeable or not.

In beginning the direct examination concerning defendant's prior crimes and police contacts, the prosecutor asked the expert whether he "had an opportunity to review [defendant]'s background and a number of the contacts that he's had." The expert said he had. The prosecutor did not ask whether the expert reviewed police reports and/or similar materials, and the expert did not volunteer as much. However, the expert did not begin working with the police department until 2000 and was not assigned to the problem-oriented policing team addressing gang activity until three years later. Consequently, the expert's knowledge of virtually all of these matters could not have been based on firsthand knowledge or anything other than police reports and the like. Also, on this record, there is no indication that any of the statements qualified under any exception to the hearsay rule. Furthermore, these matters all related to defendant and were thus case-specific facts since they related to a "participant[ ] alleged to have been involved in the case being tried." (Sanchez, supra , 63 Cal.4th at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320.)

We do not address in this case a situation where a predicate offense was committed by a defendant charged in the case being tried.

The court in Ochoa appears to have treated all predicate offense information as case-specific hearsay. (Ochoa , supra , 7 Cal.App.5th at pp. 583, 588-589, 212 Cal.Rptr.3d 703.) In Ochoa , the expert testified that people involved in the predicate offenses had admitted their gang membership. The Ochoa court concluded that these admissions were case-specific facts. The totality of the court's analysis on this is as follows: "It seems clear the hearsay at issue in the present case-out-of-court statements by individuals admitting being members of the [gang]-are case-specific hearsay rather than general background information about the [gang]. Sanchez gave the following as one in a series of examples of the distinction: 'That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang.' [Citation.] By analogy, that someone admitted being a gang member is also a case-specific fact. " (Ochoa , at pp. 588-589, 212 Cal.Rptr.3d 703, italics added.) But in the Sanchez court's example, it is not clear whether the court was referencing a hypothetical associate who was a participant in the events "involved in the case being tried" (Sanchez, supra , 63 Cal.4th at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320 ) or a fellow gang member not involved in the case, but who had otherwise committed an unrelated predicate offense. We think the Sanchez court meant the former, not the latter, as an example of a case-specific fact. We arrive at this conclusion because: (1) the issue before the Sanchez court did not relate to facts underlying predicate offenses, but rather related to facts establishing the defendant's gang membership (gang experts often look to past and current occasions when a defendant was in the company of gang members as indicia of the defendant's gang membership), and (2) the court's explanation of background facts includes facts related to the conduct, history and operations of the gang. Consequently, we do not agree with the Ochoa court's conclusion that the Sanchez example has application to predicate offenses. Accordingly, to the extent that Ochoa can be read as holding that all predicate offense testimony is case-specific hearsay, we respectfully disagree.

"A violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show beyond a reasonable doubt that the error did not contribute to the verdict obtained." (People v. Pettie (2017) 16 Cal.App.5th 23, 64, 224 Cal.Rptr.3d 160.)

We realize, of course, that an assailed person has no duty to retreat and is entitled to stand his ground or pursue the assailant until the danger of bodily injury or death has passed, even if safety could have been achieved by retreating. (People v. Hughes (1951) 107 Cal.App.2d 487, 494, 237 P.2d 64 ; see also CALCRIM No. 505.) Nevertheless, we may consider defendant's failure to leave when he had a chance, his re-engagement with the victim, his refusal to disengage and his conduct in following the victim into the street instead of leaving as evidence that defendant did not shoot the victim because he was in fear of the immediate use of deadly force against him.

In a petition for rehearing, defendant asserts the video shows Thammavongsa ''raising and lowering his arm in an angry gesture as the group surrounds defendant.'' (Petn. for rehg., pp. 8-9) We disagree. At the point defendants cites in the video, defendant walked out from the recessed entry to Sisoukchaleun's group on the sidewalk and words were exchanged. Thammavongsa, who had his back to this group and to defendant and was facing the glass window of the store, gestured to someone or something in the store with his right arm. Because defendant joined Sisoukchaleun's group in the entryway, they were around him, but the video does not show Thammavongsa marking the gesture towards defendant he describes.

Additionally, even assuming the predicate offense testimony we discussed ante should have been precluded, there is still compelling evidence in the form of the certified court records showing convictions for the predicate offenses the expert testified about. Those records include verdict forms showing two of the defendants were convicted of active participation of a criminal street gang and noted the name of the gang-"Meadowview Bloods."

Defendant also claims on appeal that counsel was ineffective for failure to register specific and timely objections to this evidence pursuant to Evidence Code sections 350 (Only relevant evidence admissible), 352 (Discretion of court to exclude evidence), and 1101 (Evidence of character to prove conduct). " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " (People v. Carrasco (2014) 59 Cal.4th 924, 982, 175 Cal.Rptr.3d 538, 330 P.3d 859, quoting Strickland, supra , 466 U.S. at p. 697, 104 S.Ct. 2052.) Having concluded that defendant did not suffer prejudice as a result of the admission of this evidence, we need not additionally address defendant's contentions that counsel's performance fell below an objective standard of reasonableness based on failure to make timely and specific objections under these provisions of the Evidence Code.

We discuss and reject defendant's other ineffective assistance claims in the unpublished part of this opinion, post .

See footnote *, ante .

Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.